## UNITED STATES DISTRICT COURT FOR THE
## EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| **C.A.** | |
| Plaintiff, | **No.: 2:24-cv-04434-KNS** |
| v. | |
| **VILLANOVA UNIVERSITY, et al.** | Electronically Filed |
| Defendants. | |

---

### PLAINTIFF'S BRIEF IN OPPOSITION TO
### DEFENDANT VILLANOVA UNIVERSITY'S
### MOTION FOR JUDGMENT ON THE PLEADINGS

---

Plaintiff, C.A. by and through her attorneys, Jay L. Edelstein, Esquire, Stephen J. Pokiniewski, Esquire, and Edelstein Law, LLC, respectfully submit this Brief in Opposition to Defendant Villanova's Motion for Judgment on the Pleadings pursuant to Fed. R. Civ. P. 12(c).

Respectfully Submitted,

**EDELSTEIN LAW, LLP**

Jay L. Edelstein, Esquire
ID No. 30227
230 S. Broad Street, Suite 900
Philadelphia, PA 19102
(215) 893-9311
JEdelstein@edelsteinlaw.com

## <u>TABLE OF CONTENTS</u>

INTRODUCTION ........................................................................................................1

QUESTIONS PRESENTED.......................................................................................1

FACTUAL SUMMARY AND PROCEDURAL HISTORY.........................................2

    A. THE MUTUALLY DANGEROUS HISTORY OF DEFENDANT VILLANOVA AND
    "THE COURTS" ...................................................................................................2

    B. "SYLLY NIGHT" AND DEFENDANT VILLANOVA'S WILLFUL
    BLINDNESS TOWARD THE SAFETY AND WELFARE OF ITS STUDENTS ................4

    C. "SYLLY NIGHT" ON AUGUST 24, 2022 .....................................................5

    D. THE RAPE AND SEXUAL ASSAULT OF C.A. ...............................................6

    E. PROCEDURAL HISTORY .............................................................................. 6

LEGAL STANDARD ............................................................................................. 7

ARGUMENT ......................................................................................................9

    A. RULE 12(C) DOES NOT PERMIT EXPANSION OF THE PLEADINGS
    THROUGH EXTRINSIC DOCUMENTS ..............................................................10

        1.  The Second Amended Complaint Relies on a Narrow, Identified Set of Documents 10

        2.  Villanova's Voluminous Attachments Are Defensive Exhibits,
            Not "Integral" Documents of the SAC .........................................................12

        3.  Rule 12(c) Prohibits This Expansion as a Matter of Law ............................................13

    B. VILLANOVA'S OWN EXHIBITS RAISE FACT QUESTIONS REGARDING
    ADEQUACY AND EFFECTIVENESS OF WARNINGS AND PROTECTIONS .............14

        1.  The Absence of a *Sylly Night/Week–Specific* Safety Approach ................................ 15

        2.  Existence of Policies Does Not Establish Adequacy as a Matter of Law ..................16

        3.  *Effectiveness* Depends on Implementation, Not Paper; and Villanova
            Offers No Evidence that the Students Involved Received and
            Completed Their Programs .........................................................................16

i

4.  The "Red Zone" Problem: Passive Warnings and Inadequate
Protections During Sylly Night/Week .......................................................................18

5.  Residence Hall Safety Measures Turn on Execution, Not Outline—
Precluding Rule 12(c) Relief .....................................................................................19

6.  "Mandatory" Programs Without Monitoring or Metrics
Are Not Meaningful.................................................................................................. 20

C. THE COURT'S RELIANCE ON EXTRINSIC MATERIALS WOULD
REQUIRE RULE 12(D) CONVERSION TO SUMMARY JUDGMENT ........................... 21

D. THE NEED FOR EXPERT EVALUATION CONFIRMS THESE ISSUES
ARE NOT AMENABLE TO PLEADINGS-STAGE RESOLUTION  .................................23

CONCLUSION .......................................................................................................................24

## <u>TABLE OF AUTHORITIES</u>

*Cases*

*Citisteel USA, Inc. v. Gen. Elec. Co.,*
78 F. App'x 832, 835 (3d Cir. 2003) ................................................................................ 21, 22

*Cortec Indus., Inc. v. Sum Holding L.P.,*
949 F.2d 42, 48 (2d Cir. 1991) ........................................................................................22

*Doe v. Princeton Univ.,*
30 F.4th 335, 342 (3d Cir. 2022) ........................................................................... 8, 13

*Gatti v. W. Pennsylvania Teamsters & Emps. Welfare Fund,*
No. 07-1178, 2008 WL 794516, at *1 (W.D. Pa. Mar. 24, 2008) ............................... 22

*In re Asbestos Prods. Liab. Litig. (No. VI),*
822 F.3d 125, 133–34 (3d Cir. 2016) ........................................................................22

*In re Burlington Coat Factory Sec. Litig.,*
114 F.3d 1410, 1426 (3d Cir. 1997) ........................................................................8, 13

*Jablonski v. Pan Am. World Airways, Inc.,*
863 F.2d 289, 290–91 (3d Cir. 1988) ..........................................................................7

*Messer v. V.I. Urban Renewal Bd.,*
623 F.2d 303 (3d Cir. 1980) ........................................................................................22

*Morgan v. Church's Fried Chicken,*
829 F.2d 10, 11 (6th Cir. 1987) ...................................................................................7

*PBGC v. White Consol. Indus.,*
998 F.2d 1192, 1196 (3d Cir. 1993) ..........................................................................22

*Pryor v. Nat'l Collegiate Athletic Ass'n,*
288 F.3d 548, 559 (3d Cir. 2002) ..............................................................................22

*Republic Steel Corp. v. Pennsylvania Eng'g Corp.,*
785 F.2d 174, 182 (7th Cir. 1986) ..............................................................................7

*Rosenau v. Unifund Corp.,*
539 F.3d 218, 221 (3d Cir. 2008) ................................................................................7

*Santomenno ex rel. John Hancock Trust v. John Hancock Life Ins. Co. (U.S.A.),*

768 F.3d 284, 290 (3d Cir. 2014) ...................................................................8

*Slotnick v. Garfinkle*,
632 F.2d 163, 165 (1st Cir. 1980) .................................................................7

*Turbe v. Gov't of V.I.*,
938 F.2d 427, 428 (3d Cir. 1991) ..................................................................7

*Wolfington v. Reconstructive Orthopaedic Assocs. II PC*,
935 F.3d 187, 195–96 (3d Cir. 2019) ...................................................7, 8, 13

*Ad–Hoc Comm. of Baruch Black & Hispanic Alumni Ass'n v. Bernard M. Baruch College*,
835 F.2d 980, 982 (2d Cir. 1987) ..................................................................7

**Statutes**

18 Pa.C.S. § 3121(a)(3) ..................................................................................6
18 Pa.C.S. § 3124.1 ........................................................................................6
18 Pa.C.S. § 3126(a)(1) ..................................................................................6
18 Pa.C.S. § 3126(a)(4) ..................................................................................6

**Rules**

Fed. R. Civ. P. 12(b)(6) ....................................................................7, 21, 22
Fed. R. Civ. P. 12(c) .............................1, 7, 8, 9, 10, 12, 13, 14, 15, 19, 21, 23, 24
Fed. R. Civ. P. 12(d) ..............................................................1, 2, 21, 22, 24
Fed. R. Civ. P. 56 ........................................................................8, 21, 22

**Secondary Authorities**

5A C. Wright & A. Miller, Federal Practice and Procedure § 1367, at 515 (1990) ................7

**Other Resources**

2019 Association of American Universities (AAU) Campus Climate Survey ......................18

Department of Justice, Office of Justice Programs, Bureau of Justice Statistics,
Rape and Sexual Victimization Among College-Aged Females, 1995-2013 (2014) .............18

RAINN (Rape, Abuse & Incest National Network) ...............................................18

The Center for Women and Families .............................................................19

## INTRODUCTION

This Court has already defined the governing framework for this case. In denying Villanova University's motion to dismiss the Second Amended Complaint, the Court held that Plaintiff plausibly alleged duties to warn and to protect, that those duties could be triggered by Villanova's actual or constructive knowledge of heightened risks associated with student alcohol use and sexual assault, and that the adequacy of Villanova's response presented fact-bound questions worthy of discovery. Villanova's present Motion for Judgment on the Pleadings does not disturb that ruling; it attempts to evade it. Unable to secure dismissal on the pleadings, Villanova now seeks judgment by attaching voluminous extrinsic materials to its Answer and urging the Court to credit those materials as dispositive proof of compliance and reasonableness.

The threshold issue is therefore procedural: whether Villanova's extrinsic materials may be considered at all on a Rule 12(c) motion. They may not, because a defendant may not expand the pleadings with policies, training materials, and affidavits to transform disputed factual questions into matters of law. And even if considered, those materials do not resolve the issues the Court previously identified; they describe programs in the abstract without establishing how they were implemented, enforced, or made effective in practice. Rather than foreclosing Plaintiff's claims, Villanova's submissions confirm the need for fact discovery and expert evaluation.

Villanova is not entitled to judgment on the pleadings. The motion should be denied. In the alternative, if the Court considers any materials outside the pleadings, Rule 12(d) mandates conversion to summary judgment and a reasonable opportunity for Plaintiff to conduct discovery and supplement the record.

## QUESTIONS PRESENTED

Q1.    Whether Rule 12(c) permits Villanova University to expand the pleadings by relying on extrinsic documents attached to its Answer—documents not incorporated in, relied

1

upon, or integral to the Second Amended Complaint—to obtain judgment as a matter of law.

*Suggested Answer: NO*

Q2.   Whether Villanova's reliance on generalized policies, training materials, and affidavits—without evidence of implementation, enforcement, or effectiveness—warrants judgment on the pleadings, instead of the need for discovery.

*Suggested Answer: NO*

Q3.   Whether consideration of Villanova's extrinsic materials would require conversion of the motion to summary judgment under Rule 12(d) and the provision of a reasonable opportunity for Plaintiff to conduct fact and expert discovery and supplement the record.

*Suggested Answer: YES*


## FACTUAL SUMMARY AND PROCEDURAL HISTORY

### A.   THE MUTUALLY DANGEROUS HISTORY OF DEFENDANT VILLANOVA AND "THE COURTS"

As articulated in Plaintiff C.A.'s Second Amended Complaint ("SAC"), Defendant Villanova is known to have a drug, alcohol and sexual assault/abuse and rape problems on its campus.  Defendant Villanova's "Annual Security and Fire Safety Report" of 2023 reported, in part, the following statistics for the years 2020, 2021 and 2022:

| INCIDENT TYPE | 2020 | 2021 | 2022 |
|---|---|---|---|
| RAPE | 3 | 13 | 10 |
| FONDLING | 1 | 7 | 3 |
| STALKING | 2 | 5 | 1 |
| DATING VIOLENCE | 0 | 2 | 10 |
| LIQUOR LAW – REFERRALS | 358 | 355 | 271 |
| DRUG LAW – REFERRALS | 44 | 29 | 45 |

See SAC ¶ 38.

The sordid relationship of Defendant Villanova, College Hall, and the Courts was widely known to Defendants, and chronicled by *The Villanovan*, an accredited student-run newspaper of Villanova since its founding in 1916. See SAC ¶ 39. On or about February 21, 2024, the Villanovan published an article entitled "Community Tightens Around the Future of College Hall," which included the following quotes:

    a.   "College Hall is home to more than 100 Villanova students."

    b.   "College Hall has been the recent recipient of a concerted effort by both the Lower Merion Police Department (LMPD) and the University to crack down on residents' behavior and conduct."

    c.   "College Hall is its own animal," Lieutenant Edward Sarama of the LMPD said. "It's an echo chamber."

    d.   "Police reports from the first two weeks of the Fall 2022 semester indicated that the LMPD received three complaint calls from community members related to College Hall. However, the same reports from the first two weeks of the Fall 2023 semester indicate that the LMPD received 10 complaint calls from the community related to College Hall."

    f.   "Traditional itself, this cycle of consequences appears to be a norm for the University."

See SAC ¶ 40-41. Additionally, RTKL records establish long-standing institutional notice regarding 801 Montgomery Avenue ("The Courts"), including:

- 184 calls for service between March 6, 2021 and March 6, 2024, approximately 164 police responses, involving noise complaints, disturbances, suspicious activity, burglaries, and directed/foot patrols, as well as fire and EMS responses to fire alarms, individuals passing out, overdoses, head injuries, and other medical emergencies (SAC ¶ 47);

- Approximately 25 email chains (2016–2024) among Township officials, police, board members, Marks representatives, and Villanova representatives concerning revocation of approval to rent to students, court proceedings and fines against Marks, property inspections and citations, and meetings involving Marks, Villanova, and Villanova students (SAC ¶¶ 48–49);

- More than 50 municipal documents dating back to 1993 addressing student-occupancy limits, eviction commitments for violations, repeated disorderly conduct

at The Courts, and a 2023 letter documenting ongoing violations of student-residency limits (SAC ¶¶ 50–51).

At all relevant times, Defendant Villanova knew or should have known that The Courts was a persistent locus of underage alcohol consumption, drug- and alcohol-fueled student parties, and repeated violations of law by generations of Villanova students, based on long-standing notice of ongoing student misconduct at that location. See SAC ¶¶ 42–46, 52–53.

### B.    "SYLLY NIGHT" AND DEFENDANT VILLANOVA'S WILLFUL BLINDNESS TOWARDS THE SAFETY AND WELFARE OF ITS STUDENTS, LIKE C.A.

In her freshman year, C.A. attended Freshman Orientation. Defendant Villanova's Freshman Orientation was an opportunity to inform students of all the dangers their students might face. Yet, Defendant Villanova' s Freshman Orientation:

- Failed to provide any specific instruction or guidance regarding on- or off-campus alcohol and/or drug use and/or abuse. See SAC ¶ 25.

- Failed to provide any specific instruction or guidance regarding sexual abuse and/or misconduct. See SAC ¶ 26.

- Failed to provide any warnings regarding on- or off-campus alcohol and/or drug use and/or abuse. See SAC ¶ 27.

- Failed to inform students about the dangerous activities that would transpire at College Hall Apartments a.k.a The Courts. See SAC ¶ 27

Defendant Villanova also failed its returning students, in that it:

- Failed to provide any orientation to returning students or sophomores, including C.A. See SAC ¶ 21.

- Failed to provide any instruction or guidance regarding on- or off-campus alcohol and/or drug use and/or abuse. to returning students or sophomores including C.A. See SAC ¶ 22.

- Failed to provide any instruction or guidance regarding sexual abuse and/or misconduct to returning students on sophomores including C.A. See SAC ¶ 23.

4

> ■ Failed to warn students, including C.A., to exercise caution or refrain
> from alcohol or drug use or sexual misconduct—on or off campus,
> including at College Hall Apartments a/k/a The Courts—prior to the
> events at issue. See SAC ¶ 28.

In August 2022, C.A. was a returning sophomore and a resident of Sheehan Hall at Defendant Villanova. See SAC ¶¶ 19-20. The first day of classes at Defendant Villanova that year was August 24, 2022. See SAC ¶ 29.

The first week of classes from the first day of classes through the end of that weekend, is known as "Sylly Week," as that is the period of time when students review their course syllabi with their professors. See SAC ¶30. The evening of the first day of classes at Defendant Villanova is known by students to be the first night of parties on- and off-campus.  Furthermore, some Defendant Villanova students may refer to this night as "Sylly night." See SAC ¶ 31. "Sylly Night" is a time that Defendant Villanova students, including underaged students, attend parties, drink alcohol served to them by other students, some of legal age, others not of legal age, causing them to become intoxicated and act in an irrational manner. See SAC ¶ 32. A large percentage of Defendant Villanova students, including underaged students, attend "Sylly Night" at The Courts. See SAC ¶ 33. Defendant Villanova did not send any text or e-mail messages or alerts to its students, including C.A., to exercise caution or refrain from engaging in on- or off-campus alcohol and/or drug use and/or abuse or sexual abuse and/or misconduct, if they did indeed decide to attend any "sylly night" activities. See SAC ¶ 37.

### C.    "SYLLY NIGHT" ON AUGUST 24, 2024

On August 24, 2022, at approximately 10:00 p.m., C.A. attended "sylly night" at The Courts along with Defendant Villanova students. See SAC ¶¶ 54-55. There was no security and no police on location. See SAC ¶ 56. Students had unfettered access to the hallways and apartments of The Courts. See SAC ¶ 57. There were multiple rooms with open doors and large masses of

5

Defendant Villanova students, many of whom C.A. believed to be under the age of 21, roaming the hallways and entering and leaving multiple rooms. See SAC ¶ 58. Innumerable amounts of bottles of liquor and beer were in plain view. See SAC ¶ 59. C.A. became highly intoxicated along with Defendant Villanova students that night. See SAC ¶ 63.

### D.    THE RAPE AND SEXUAL ASSAULT OF C.A.

Highly intoxicated, C.A. returned to her dormitory on Defendant Villanova's campus sometime after midnight on August 25, 2022. See SAC ¶ 66. Defendant Katzenell texted C.A. and asked her to come to his dorm room in Sheehan Hall (room 202) upon her return. See SAC ¶ 67.

Upon entering Defendant Katzenell's room, and after consuming more alcohol, she passed out. See SAC ¶ 70-71. She woke up at approximately 2:00 p.m. that day back in her own dorm room, wearing a t-shirt that was not hers and no underwear. Katzenell was charged with Rape of an Unconscious Victim (18 Pa.C.S. § 3121(a)(3)), Sexual Assault (18 Pa.C.S. § 3124.1), and Indecent Assault (18 Pa.C.S. § 3126(a)(1), (a)(4)). Katzenell later pleaded guilty to Sexual Assault in the Delaware County Court of Common Pleas, Docket No. CP-23-CR-0000137-2024. A consent search of Defendant Eguiguren's cellphone recovered a video depicting Katzenell engaging in sexual intercourse with C.A. while she was unconscious. See SAC ¶¶ 73–75.

### E.    PROCEDURAL HISTORY

This action was initiated with a Complaint filed on August 22, 2024, in the Philadelphia Court of Common Pleas. Defendant Villanova University removed the action to this Court on August 23, 2024. (ECF Doc. 1). Plaintiff filed a SAC on November 12, 2024. (ECF Doc. 21). On or about December 12, 2024, Defendants filed motions to dismiss the Second Amended Complaint, including a motion filed by Villanova University. (ECF Doc. 25). By Memorandum Opinion and Order dated September 8, 2025, this Court denied Villanova's motion to dismiss,

holding that Plaintiff plausibly alleged duties to warn and to protect, as well as foreseeability and proximate cause, and that the claims were worthy of discovery. (ECF Doc. 70 and 71). Villanova thereafter filed its Answer to the Second Amended Complaint, attaching voluminous exhibits. (ECF Doc. 76 and Doc. 77, *with Exhibits A through NN*). On January 15, 2026, Villanova filed the present Motion for Judgment on the Pleadings pursuant to Rule 12(c). (ECF Doc. 94). The Court subsequently granted Plaintiff an extension of time to file a Response (ECF Docs. 95).

## **LEGAL STANDARD**

Under a Rule 12(c) motion, this court must "apply the same standards as under Rule 12(b)(6)." Turbe v. Gov't of Virgin Islands, 938 F.2d 427, 428 (3d Cir. 1991) (citing Ad–Hoc Committee of Baruch Black and Hispanic Alumni Ass'n v. Bernard M. Baruch College, 835 F.2d 980, 982 (2d Cir. 1987); Morgan v. Church's Fried Chicken, 829 F.2d 10, 11 (6th Cir. 1987); Republic Steel Corp. v. Pennsylvania Eng'g Corp., 785 F.2d 174, 182 (7th Cir. 1986); Slotnick v. Garfinkle, 632 F.2d 163, 165 (1st Cir. 1980); 5A C. Wright & A. Miller, Federal Practice and Procedure § 1367, at 515 (1990)). Judgment on the pleadings "will not be granted" unless the movant clearly establishes that no material issue of fact remains to be resolved and that he is entitled to judgment as a matter of law. Rosenau v. Unifund Corp., 539 F.3d 218, 221 (3d Cir. 2008) (citing Jablonski v. Pan Am. World Airways, Inc., 863 F.2d 289, 290–91 (3d Cir. 1988). In applying this standard, the Court must view the facts presented in the pleadings and the inferences to be drawn therefrom in the light most favorable to the nonmoving party. Id.

Defendant Villanova's Motion correctly concedes that "…in deciding a motion for judgment on the pleadings, a court may only consider 'the complaint, exhibits attached to the complaint, matters of public record, as well as undisputedly authentic documents if the complainant's claims are based upon these documents.'" See Def. Motion p. 4. (citing Wolfington

7

v. Reconstructive Orthopaedic Assocs. II PC, 935 F.3d 187, 195–96 (3d Cir. 2019)). See also

Santomenno ex rel. John Hancock Trust v. John Hancock Life Ins. Co. (U.S.A.), 768 F.3d 284,

290 (3d Cir.2014) ("a court considering a motion to dismiss under Federal Rule of Civil Procedure

12(b)(6) may consider *only* the allegations contained in the pleading to determine its sufficiency")

(emphasis in original).  Indeed, "a district court ruling on a motion to dismiss may not consider

matters extraneous to the pleadings." In re Burlington Coat Factory Sec. Litig., 114 F.3d 1410,

1426 (3d Cir. 1997). To be sure, where a document is "integral to or explicitly relied upon in the

complaint," it "may be considered without converting the motion to dismiss into one for summary

judgment" under Rule 56. Doe v. Princeton Univ., 30 F.4th 335, 342 (3d Cir. 2022) (citations

omitted). "But consideration only goes so far. When the truth of facts in an "integral" document

are contested by the well-pleaded facts of a complaint, the facts in the complaint must prevail." Id.

Here, Villanova brings **dozens of documents appended to its Answer**—including

policies, training materials, internal presentations, and affidavits—offered to contradict the SAC

and establish Villanova's compliance as a matter of law. That request exceeds the permissible

scope of Rule 12(c). "If the court considers matters outside pleadings other than documents

"integral to or explicitly relied upon in the complaint," the "motion must be treated as one for

summary judgment under Rule 56." Wolfington, 935 F.3d at 195-196. Conversion from Rule 12(c)

to summary judgment requires that "the procedures of Rule 56 govern," including notice and an

opportunity to present evidence. Id. Accordingly, before the Court may reach the substance of

Villanova's defenses, it must first determine whether the extrinsic evidence falls within the limited

universe of documents properly considered on a Rule 12(c) motion. They do not.

## ARGUMENT

This Court's prior Memorandum Opinion establishes the governing framework for Villanova's Rule 12(c) motion—and that framework forecloses the relief Villanova now seeks. In denying Villanova's motion to dismiss, the Court held that Plaintiff plausibly alleged that Villanova owed C.A. a duty as an invitee, and that this duty could be triggered if Villanova had actual or constructive knowledge of criminal conduct by third parties on campus. The Court expressly recognized that whether Villanova possessed such knowledge presents a factual question not amenable to resolution at the pleadings stage. (ECF Doc. 70, pp. 6–7).

Applying Restatement (Second) of Torts § 343, the Court held that Plaintiff adequately alleged that Villanova plausibly had at least constructive knowledge that heavy student drinking—and the attendant risk of sexual assault—was more likely in its residential halls during Sylly Night. Critically, the Court emphasized that discovery may confirm or refute these allegations, and that Villanova's duty **"will rise or fall on the facts borne out,"** making discovery necessary. (ECF Doc. 70, p. 7) (emphasis added).

The Court further defined the scope of Villanova's duty, holding that Plaintiff plausibly alleged both a **duty to warn** and a **duty to protect** as to actions Villanova could take within its campus. Under the duty to warn, Plaintiff alleged failures to warn students about underage alcohol use, heightened risks of sexual assault, and the effects of alcohol on students' ability to protect themselves. Under the duty to protect, Plaintiff alleged failures to provide heightened security, supervision, and monitoring in residence halls and to train and deploy Resident Advisors during Sylly Night. The Court held these allegations sufficient to proceed. (ECF Doc. 70 at 8).[1]

---

[1] The Court also held that Plaintiff adequately alleged proximate cause, concluding that Villanova's alleged failure to provide warnings and heightened protections could plausibly be found to have increased the risk of sexual assault and to have been a substantial factor in bringing about Plaintiff's harm. The Court expressly rejected the argument that the intervening criminal act necessarily severed causation at the pleading stage. (ECF Doc. 70 at 9–10).

Against this backdrop, the unintended consequence of Villanova's voluminous attachments is the *confirmation* that this Honorable Court's ruling on 12(b)(6) was indeed the *correct* one. Villanova's Rule 12(c) motion does not present a new legal issue left open by the Court's prior ruling. Instead, it attempts to repackage the same fact-bound questions—knowledge, foreseeability, adequacy of warnings, and effectiveness of protections—as questions of law by attaching voluminous extrinsic materials to its Answer and urging the Court to credit them as dispositive. That effort must fail. The threshold question is whether those materials may be considered at all on a Rule 12(c) motion; and even if they were, they do not resolve the issues identified by the Court as a matter of law, but instead confirm why discovery—or conversion to summary judgment—would be required.

### A.    RULE 12(C) DOES NOT PERMIT EXPANSION OF THE PLEADINGS THROUGH EXTRINSIC DOCUMENTS

#### 1.    <u>The Second Amended Complaint Relies on a Narrow, Identified Set of Documents</u>

First, the SAC expressly relies on Villanova's Annual Security and Fire Safety Report, to plead institutional notice of pervasive sexual violence, underage alcohol use, and related criminal activity on campus. See SAC ¶ 38. The SAC quotes and tabulates Villanova's reported crime statistics for the years 2020 through 2022, including incidents of rape, fondling, stalking, dating violence, liquor law referrals, and drug law referrals. <u>Id.</u> Those statistics are pleaded to support allegations that Villanova "is known to have a drug, alcohol and sexual assault/abuse and rape problem on its campus," and that Villanova had actual knowledge of escalating risks to students well before August 2022. <u>Id.</u> Importantly, Plaintiff relied on the Report—not on the issue of compliance—but, rather as a factual predicate of notice and foreseeability. <u>See</u> <u>id</u>.; <u>see also</u> SAC

¶¶ 90–91 (alleging misrepresentation of campus safety "[b]ased upon the aforementioned statistics").

Next, the SAC expressly identifies and quotes a specific student-newspaper article published by *The Villanovan* on February 21, 2024, entitled "Community Tightens Around the Future of College Hall." SAC ¶¶ 39–41. The Complaint pleads the article's provenance, explains its institutional relevance, and then quotes multiple statements attributed to Villanova administrators and Lower Merion police officials. Id. ¶¶ 39–41(a)–(f). Those quotations describe, among other things:

- College Hall's long-standing role as housing for Villanova students,
- coordinated enforcement efforts between Villanova and local police,
- repeated police responses to College Hall during the Fall 2022 semester, and
- Villanova's routine receipt of referrals arising from student misconduct at College Hall.

The article is relied upon to plead Villanova's actual awareness of chronic underage drinking, disorderly conduct, and enforcement problems at College Hall, including during the precise time frame relevant to Plaintiff's assault—Sylly Night/Week. See id. ¶ 42. The Complaint does not dispute the article; it uses Villanova's own public acknowledgments as evidence of longstanding notice and institutional knowledge.

Third, the SAC expressly relies on the Affidavit of Probable Cause generated in connection with the criminal prosecution of Katzenell. SAC ¶¶ 75–77. The Affidavit is cited repeatedly and specifically to plead core facts underlying Plaintiff's claims, including:

- the existence of a video recording showing Plaintiff being sexually assaulted while unconscious, id. ¶ 75;
- admissions by Defendant Polun that Plaintiff was "noticeably drunk," id. ¶ 76; and
- admissions by Polun and Eguiguren regarding their assistance in transporting Plaintiff while incapacitated, id. ¶ 77.

11

These allegations form the factual backbone of Plaintiff's claims for sexual assault, conspiracy, and negligence, and are pleaded as operative facts—not background or surplusage. See id. ¶¶ 66–78. Critically, no other Villanova policies, handbooks, training materials, emails, presentations, or declarations are identified, quoted, or relied upon anywhere in the Second Amended Complaint. The Complaint does not incorporate by reference Villanova's student handbooks, RA training modules, alcohol-education materials, or internal policy documents. Nor does it premise any claim on the adequacy/inadequacy of the specific content of those materials. The universe of documents integral to the SAC is therefore intentionally small and clearly defined.

### 2. Villanova's Voluminous Attachments are Defensive Exhibits, Not "Integral" Documents of the SAC Under Rule 12(c)

To be precise, 38 of Villanova's 40 attachments to their Answer are not referred to at all in the Second Amended Complaint ("SAC"). They could not have been, as these documents were solely in the possession of Villanova and are only now available to Plaintiff—attached for the first time to the Answer—in an apparent effort to make an end-run around this Court's prior denial of Villanova's Motion to Dismiss.

The distinction is neither subtle nor academic. The SAC places Villanova's compliance regime squarely at issue by alleging systemic failures to warn, train, supervise, and protect students in the face of known and recurring risks. What the SAC does not—and could not—do at the pleadings stage is adjudicate the adequacy, implementation, or effectiveness of Villanova's internal policies, trainings, or compliance programs, all of which were solely within Villanova's possession prior to discovery.

Thus, the SAC does not identify, quote, incorporate, or rely upon the following categories of information Villanova attached to its Answer:

- Student Handbooks (any year);
- RA training modules (any version);

- "Slide decks,"training presentations;
- "Rethinking Drinking" materials;
- Alcohol-education pamphlets or informational brochures;
- AlcoholEdu program
- Parent or family guides;
- Orientation schedules/programming;

- Declarations of Villanova administrators;
- Emails to students or families;
- Posters, campaigns, or facilitation guides;
- Federal regulations appended for context (including 34 C.F.R. § 668.46);
- Academic calendars; or
- Daily crime logs.

The SAC does not incorporate these documents by reference, does not depend on their terms, and does not premise any claim on their contents. Instead, the SAC relies on a narrow, expressly identified set of materials to plead notice, foreseeability, and causation, while reserving for discovery and expert analysis the factual questions surrounding whether Villanova's purported policies were mandatory, enforced, or effective. By stark contrast, the voluminous extrinsic materials Villanova now urges the Court to consider appear nowhere in the pleadings and are offered to resolve contested compliance questions that cannot be decided on a Rule 12(c) record.

### 3.    Rule 12(c) Prohibits This Expansion as a Matter of Law

Turning back to instant Motion, Villanova correctly acknowledged the Court may consider only "the complaint, exhibits attached to the complaint, matters of public record, [and] undisputedly authentic documents if the complainant's claims are based upon these documents." Wolfington, 935 F.3d at 195–96. Consistent with that rule, courts may not consider "matters extraneous to the pleadings" at this stage. In re Burlington Coat Factory, 114 F.3d at 1426.

The limited exception for documents "integral to or explicitly relied upon in the complaint" does not apply here. Doe v. Princeton Univ., 30 F.4th at 342. Even where a document is arguably integral, "when the truth of facts in [that] document are contested by the well-pleaded facts of a complaint, the facts in the complaint must prevail." Id. The doctrine does not permit defendants to introduce unilateral evidence to resolve disputed factual questions at the pleadings stage.

As a matter of law, Villanova's **classic defensive exhibits** do not belong in a Rule 12(c) inquiry. They are offered not to contextualize allegations pleaded in the SAC, but to contradict them—to argue post hoc compliance, training adequacy, and institutional reasonableness. Rule 12(c) does not permit a defendant to try its case by attaching nearly eight hundred pages of self-serving materials and seeking judgment before a single document has been tested in discovery and before a single witness has been examined. The pleadings stage is not a substitute for fact development, and Villanova's attempt to resolve disputed compliance questions on an untested paper record exceeds the proper scope of judgment on the pleadings. This should end the Court's inquiry and Villanova's Motion should be denied.

**B.    VILLANOVA'S OWN EXHIBITS RAISE FACT QUESTIONS REGARDING ADEQUACY AND EFFECTIVENESS OF WARNINGS AND PROTECTIONS**

Even if the Court were to look past Rule 12(c)'s limits and consider Villanova's extrinsic materials—which raise factual disputes concerning Villanova's policies—it is instructive to consider what Villanova did not attach. **Noticeably absent** are any documents demonstrating that Villanova's purported education and training efforts were actually delivered to, received by, or understood by any of the students involved. With respect to C.A., Katzenell, Polun, and Eguiguren, Villanova attaches:

- **No record of completion** of any alcohol education (including AlcoholEdu), sexual-misconduct training, or related programming;

- **No acknowledgment or certification** reflecting receipt of warnings or materials;

- **No contemporaneous documentation** showing participation in, or exposure to, any of the cited programs; and

- **No witness statement**—from a RA or any university official—confirming that any such education, training, monitoring, or intervention occurred with respect to any of these four students.

That absence is not incidental. It underscores that Villanova's exhibits speak only to the existence of programs in the abstract, not to their implementation or effectiveness in practice—questions that cannot be resolved on the pleadings and instead require discovery.

### 1.    The Absence of a *Sylly Night/Week–Specific* Safety Approach

Like a missing guardrail on a known curve, Villanova's own exhibits expose a critical omission: no Sylly Night–specific protocols or safety measures. Despite known, heightened risks tied to alcohol and sexual assault during opening week, the record shows nothing tailored to that period—no mandates, no enhanced monitoring, no warnings, no enforcement. In short, there was a policy vacuum precisely when foreseeability was at its peak.

That omission is striking and it matters. Risk mitigation is inherently temporal. Generalized policies designed for ordinary campus conditions do not, by their existence alone, address known spikes in danger. Whether Villanova exercised reasonable care during Sylly Night/Week turns on what measures—if any—it implemented in response to that predictable risk, not on whether it maintained year-round policies in the abstract The absence of any Sylly Night/Week–specific framework raises fact-bound questions concerning Villanova's knowledge, response, and exercise of reasonable care—questions the Court has already recognized are not amenable to resolution on the pleadings and must be explored through discovery.

### 2.    Existence of Policies Does Not Establish *Adequacy* as a Matter of Law

Villanova's Rule 12(c) motion rests on a fundamental conflation: it treats the existence of written policies as proof of their **adequacy** under the applicable standard of care. The two are not the same. Villanova's exhibits show, at most, that the University maintained alcohol- and sexual-misconduct policies in the abstract. Indeed, the materials Villanova attaches are generic and compliance-oriented. They describe broad educational initiatives—orientation programming,

handbooks, poster campaigns, and online modules—without addressing the heightened risks associated with first-year students, on-campus residence halls, or known high-risk events such as Sylly Night/Week. Generalized policies that are untethered to foreseeably dangerous environments do not establish adequacy as a matter of law.

Put simply, it is one thing to say an institution has policies; it is another to say those policies were adequate. Adequacy turns on professional standards of care and on whether institutional responses were proportionate to the risks presented. The question of whether Villanova's policies were adequate in light of known risks is a separate, fact-bound inquiry that cannot be resolved by reading policy documents in isolation. Answering questions of adequacy requires factual development and, where appropriate, expert evaluation. Because the instant Motion asks the Court to treat the existence of policies as proof of adequacy, Villanova seeks a merits determination the Rules simply do not permit. Adequacy is a standards-of-care question, not a pleadings question.

   3.   ***Effectiveness* Depends on Implementation, Not Paper; and Villanova Offers No Evidence that the Students Involved Received and Completed Their Programs**

Villanova relies on staff affidavits to convert policy existence into proof of effectiveness. Those affidavits cannot carry that burden. They speak to program design and administrative intent, not to actual delivery, documented receipt, or demonstrated completion by the students involved. Plainly stated: **the policies address what Villanova planned to do, not what was actually done.** As demonstrated below, "broad distribution" is not evidence of exposure, and exposure is not evidence of effectiveness.

Stacy Andes, Villanova's *Director of Health Promotion*, attests that certain alcohol-education materials were "educational resource[s] broadly distributed to the Villanova undergraduate student body" during the relevant academic years (Andes Aff., VU000756–57). She

16

does not identify how the materials were distributed, to whom they were delivered, whether students reviewed them, or whether any acknowledgment or completion was required. "

The affidavits addressing Resident Assistant ("RA") training suffer from the same defect. Dillon Eppenstein, *Director for Residential Programs*, states that certain documents were an "itinerary" RAs were instructed to follow for mandatory "floor meetings" with upper-class students, and that, "upon information and belief, "all floor meetings which were held followed the assigned itinerary." (Eppenstein Aff., VU000756, ¶¶ 4-5). That formulation—*"upon information and belief" coupled with pervasive passive voice*—does not constitute proof of implementation. Instead, it invites a basic factual inquiry[2] that can only be satisfied with discovery. Left alone, Eppenstein's passive assertions identify no RA, no residence hall, no meeting, no monitoring, and no enforcement or proof of completion. The remaining staff affidavits are no different.

Sydney Scheiner, *Assistant Dean of Students*, similarly states that policy documents "were used" in mandatory RA training during various semesters (Scheiner Aff., VU000757, ¶¶ 3-4), without identifying what was taught, how compliance was ensured, or whether the training translated into conduct in the residence halls. Ryan Rost, Villanova's *Title IX Coordinator*, avers that multiple documents "were used" in RA training, orientation, or campus programming and that

---

[2] For example, Eppenstein's affidavit leaves unanswered basic factual questions necessary to establish implementation, including:
  Q1.  Who specifically instructed Resident Assistants to follow the referenced itinerary;
  Q2.  When those instructions were given, and by what means (written directive, training session, email, or otherwise);
  Q3.  Which Resident Assistants were assigned to conduct the purportedly "mandatory" floor meetings;
  Q4.  Whether any floor meetings were actually held in the residence hall at issue, and on what dates;
  Q5.  How Eppenstein knows that meetings "followed the assigned itinerary," as opposed to merely being scheduled to do so;
  Q6.  What documentation, if any, exists reflecting attendance, content covered, or compliance with the itinerary;
  Q7.  Who, if anyone, was responsible for monitoring or verifying RA compliance; and
  Q8.  What steps were taken, if any, when an RA failed to hold a meeting or deviated from the itinerary?

certain programs were "mandatory" for new students (Rost Aff., VU000758–59), but again offers no evidence of completion, comprehension, reinforcement, or supervision.

Collectively, these affidavits underscore the same point: Villanova relies on passive delivery—materials that were "used," "distributed," or "made available"—without any showing of enforcement, accountability, or real-world application. No affiant provides evidence that the materials were actually delivered to, received by, or effective with respect to C.A., Katzenell, Polun, or Eguiguren. received or completed the cited programs, and none describes what actually occurred in the residence halls. Effectiveness is an empirical and contextual inquiry, not one resolved by generalized affidavits. Because Villanova's own submissions do not establish implementation or impact, not only cannot support judgment on the pleadings, but they necessarily require fact discovery, depositions, and further analysis.

### 4. The "Red Zone" Problem: Passive Warnings and Inadequate Protections during Sylly Night/Week Raise Additional Discovery Questions

Approximately 1 in 4 undergraduate women (26.4%) experience sexual assault or misconduct involving force or incapacitation during their time in college, according to the 2019 Association of American Universities (AAU) Campus Climate Survey.[3] College-aged women (18–24) are at a 3 times higher risk of sexual assault than women in the general population, according to the Bureau of Justice Statistics (BJS 2014).[4] First-year students are at the highest risk, according to RAINN (Rape, Abuse & Incest National Network).[5] The "Red Zone" is "the period of time from the beginning of fall semester to Thanksgiving break when sexual assaults on U.S.

---

[3] https://www.aau.edu/sites/default/files/AAU-Files/Key-Issues/Campus-Safety/Revised%20Aggregate%20report%20%20and%20appendices%201-7_(01-16-2020_FINAL).pdf
[4] Department of Justice, Office of Justice Programs, Bureau of Justice Statistics, Rape and Sexual Victimization Among College-Aged Females, 1995-2013 (2014).
[5] https://rainn.org/statistics/campus-sexual-violence

college campuses spike", with "more than 50% of college sexual assaults occur in either August, September, October, or November," according to The Center for Women and Families.[6]

Villanova's own materials acknowledge these same unfortunate yet foreseeable realities. Villanova's Motion summarizes "policies, correspondence, and training materials that were in Plaintiff's possession or otherwise available to her at the relevant time" including:

> …[P]roof that C.A. and her family were specifically noticed of the alcohol education requirement and warned of the specific risks associated with use of alcohol and drugs and attending off-campus parties, particularly at the beginning of the year.

See Def. Mot. (ECF Doc. 94), p. 16 (citing ECF No. 77-23 at VU000522- VU000603, (Attachments V-W)). Indeed, Villanova's policies, training materials, and publications repeatedly recognize the nexus between alcohol use, incapacitation, and sexual assault; identify first-year students as a vulnerable population; and concede that sexual assaults disproportionately occur in campus residence halls. Thus, Villanova—try as it might—cannot genuinely or reasonably dispute that the risk profile described above is real, foreseeable, and well-documented. What it disputes— by way of attached documents—is whether its response to that known risk was adequate. That dispute is inherently factual.

Once Villanova's knowledge of the heightened risk is conceded, the adequacy and effectiveness of its response cannot be resolved on the pleadings. Whether warnings were sufficiently targeted to first-year students, whether they were meaningfully calibrated to a known spike in risk early in the semester, and whether Villanova's acknowledged awareness translated into reasonable preventative action are questions that turn on context, judgment, and factual

---

[6] https://www.thecenteronline.org/community-education-awareness/the-red-zone/

development. Villanova's acknowledgment of the risk therefore does not end the inquiry—it begins it, and it confirms that discovery is required.

>    **5.**    **Resident Hall Safety Measures Turn on Execution, Not Outline—Precluding Rule 12(c) Relief**

Villanova's residence-hall materials further underscore why Rule 12(c) relief is unavailable. Villanova indisputably exercised extensive control over its on-campus residence halls—deciding RA staffing levels, training content, patrol practices, enforcement intensity, and after-hours security protocols. Yet, the documents Villanova relies upon speak only at the level of structure and outline, not lived reality. They describe what *could* occur or what RAs were *expected* to do, without revealing what messages were actually communicated, how they were delivered, whether they were reinforced, or what oversight mechanisms ensured compliance. And absolutely **no RA materials address Sylly Night**, which was particularly known for rampant under-age drinking on- and off-campus.

The uncertainty brought about Villanova's documents is dispositive. The absence of contemporaneous documentation or witness testimony confirming what occurred inside the residence halls leaves open core factual questions about supervision, enforcement, and situational awareness. Villanova asks the Court to infer effectiveness from the mere existence of policies and training outlines. Where the record reveals control without clarity as to execution, the adequacy and effectiveness of residence-hall safety measures remain factual questions that can be answered only through discovery—not on the pleadings.

>    **6.**    **"Mandatory" Programs Without Monitoring or Metrics Are Not Meaningful**

Villanova relies heavily on AlcoholEdu[7] as a "mandatory" component of its alcohol education efforts. But a mandate without verification or consequence is no mandate at all. The materials Villanova cites—including its own descriptions of AlcoholEdu—do not establish that completion was tracked in any meaningful way. For example:

- Did Villanova activate AlcoholEdu's computer-generated completion notifications, and receive real-time notice of completion or non-completion?
- What records exist showing which students completed AlcoholEdu, and when?
- What consequences, if any, followed non-completion, including registration holds or disciplinary action?

Villanova's voluminous exhibits do not address these questions. At most, Villanova shows that AlcoholEdu was assigned. It does not show that it was completed, absorbed, or enforced.

That distinction matters at the pleadings stage. Again, without evidence of monitoring, enforcement, or consequences for non-compliance, the Court cannot infer effectiveness or adequacy or effectiveness as a matter of law. There is no way to know—on this record—whether students meaningfully engaged with AlcoholEdu, whether repeat failures prompted follow-up, or whether the program altered behavior in the residence halls. Villanova asks the Court to treat the label "mandatory" as dispositive. Rule 12(c) does not allow that shortcut. Whether a program labeled "mandatory" functioned as such in practice is a factual question, not one resolved by pointing to the program's existence. Here, effectiveness remains an open factual question requiring discovery, not dismissal.

Moreover, Villanova's exhibits contain no **metrics** by which adequacy or effectiveness could be judicially determined. The materials do not measure whether students understood the warnings they purportedly received, do not assess whether behavior changed in response to those

---

[7] See Def. Mot. (ECF Doc. 94), pp. 15-16 ("The ASR, on which Plaintiff relies, explains that all first year students are "required to satisfactorily complete an online alcohol education program called AlcoholEdu for College. No. 77-2 at VU000010").

efforts, and do not evaluate whether incidents of underage drinking or sexual assault decreased as a result. There are no feedback loops, no comprehension checks, and no outcome data tying Villanova's asserted programs to real-world impact. Without any showing of how Villanova knew its measures were working—or even whether they were working at all—the Court cannot conclude that those measures were adequate as a matter of law. Because Villanova's own exhibits raise factual questions regarding implementation, timing, adequacy, and effectiveness of its warnings and protective measures, they cannot support judgment on the pleadings and instead confirm the need for discovery under Rule 12 (c) and its progeny.

### C.    THE COURT'S RELIANCE ON EXTRINSIC MATERIALS WOULD REQUIRE RULE 12(D) CONVERSION TO SUMMARY JUDGMENT

As set forth in the Legal Standard section, if this Court considers Villanova's extrinsic materials that are not integral to the SAC, Rule 12(d) conversion to summary judgment would be required. Rule 12(d) provides that "[i]f on a motion under Rule 12(b)(6) or 12(c), matters outside the pleadings are presented to and not excluded by the court, the motion must be treated as one for summary judgment under Rule 56." Fed.R.Civ.P. 12(d); Citisteel USA, Inc. v. General Elec. Co., 78 Fed.Appx. 832, 835 (3d Cir. 2003) (quoting PBGC v. White Consol. Indus., 998 F.2d 1192, 1196 (3d Cir. 1993), cert. denied, 510 U.S. 1042, 114 S.Ct. 687, 126 L.Ed.2d 655 (1994)).

Courts in this Circuit consistently apply that rule. See Gatti v. W. Pennsylvania Teamsters & Emps. Welfare Fund, No. 07-1178, 2008 WL 794516, at *1 (W.D. Pa. Mar. 24, 2008) (holding that consideration of materials outside the pleadings requires conversion); Citisteel USA, Inc. v. Gen. Elec. Co., 78 F. App'x 832, 835 (3d Cir. 2003) (same). While a court has discretion to exclude extrinsic materials and decide a Rule 12 motion on the pleadings alone, it has no discretion to rely on such materials without converting the motion. See Pryor v. Nat'l Collegiate Athletic Ass'n, 288 F.3d 548, 559 (3d Cir. 2002).

Consideration of materials outside the pleadings on a Rule 12(b)(6) or 12(c) motion triggers Rule 12(d) conversion and a reasonable opportunity to present Rule 56 materials. *See* Fed. R. Civ. P. 12(d); In re Asbestos Prods. Liab. Litig. (No. VI), 822 F.3d 125, 133–34 (3d Cir. 2016). The purpose of this requirement is to prevent prejudice arising from the lack of notice that extrinsic materials may be relied upon. Id.; Messer v. V.I. Urban Renewal Bd., 623 F.2d 303 (3d Cir. 1980).

Any exception excusing notice of Rule 12(d) conversion where a plaintiff had actual notice of and relied upon extrinsic materials, see Cortec Indus., Inc. v. Sum Holding L.P., 949 F.2d 42, 48 (2d Cir. 1991), does not apply here, where the documents were neither relied upon in the complaint nor within Plaintiff's control, and Plaintiff has had no opportunity to test their accuracy or implementation through discovery. In those circumstances, conversion without a reasonable opportunity to supplement the record constitutes prejudice. See In re Asbestos, 822 F.3d at 133–34. Accordingly, if the Court is inclined to weigh Villanova's extrinsic materials, Plaintiff respectfully requests conversion under Rule 12(d) and a reasonable period to conduct fact and expert discovery and submit evidence responsive to those materials.

### D.     THE NEED FOR EXPERT EVALUATION CONFIRMS THESE ISSUES ARE NOT AMENABLE TO PLEADINGS-STAGE RESOLUTION

Villanova's reliance on voluminous extrinsic materials underscores—not resolves—the core problem with its Rule 12(c) motion: the adequacy and effectiveness of institutional warnings, education, and protective measures are not lay determinations capable of resolution on the pleadings. They are standard-of-care questions that routinely require expert analysis of overlapping statutory, regulatory, and professional frameworks such as: (1) the governing statutory mandates; (2) federal agency guidance identifying evidence-based practices; and (3) the effectiveness and limitations of web-based prevention programs. Each of those inquiries lies outside the competence of a court adjudicating a Rule 12(c) motion.

First, the statutory framework governing Pennsylvania universities imposes interrelated obligations concerning sexual-assault education, alcohol-risk mitigation, and student safety. Compliance turns not on the mere existence of policies, but on whether those measures were calibrated to known risks, implemented consistently with statutory purposes, and integrated into practices capable of mitigating foreseeable harm—an assessment that requires expert evaluation against accepted standards of care.

Second, federal agencies enforcing Title IX, the Clery Act, and drug-free schools mandates distinguish between low-impact informational programming and evidence-based interventions shown to reduce risk. Determining where Villanova's asserted programs fall on that spectrum cannot be accomplished by reviewing policy documents alone, but instead requires expert analysis of program design, delivery, enforcement, and effectiveness under recognized federal guidance.

Third, Villanova's reliance on web-based programs such as AlcoholEdu raises technical questions concerning functionality, completion tracking, enforcement, and behavioral impact. Whether such programs were meaningfully "mandatory," whether completion was verified, and whether non-compliance triggered consequences are not apparent from program descriptions and require expert evaluation of how such platforms operate in practice and are implemented by institutions exercising reasonable care.

The need for expert analysis thus confirms what Rule 12(c) doctrine already requires: this case cannot be decided by weighing extrinsic materials against allegations in the complaint. If Villanova wishes to litigate whether its programs were adequate and effective, it must do so on a developed record, after discovery, and with the benefit of expert evaluation—not through a premature request for judgment on the pleadings.

24

## CONCLUSION

For all of the reasons stated above, Villanova's Motion for Judgment on the Pleadings should be denied. Rule 12(c) does not permit Villanova to expand the pleadings through extrinsic, self-serving materials in order to resolve fact-bound questions the Court has already held are worthy of discovery. Even if the Court were inclined to consider Villanova's extrinsic exhibits, those materials do not establish compliance or reasonableness as a matter of law; they instead confirm that the core issues in this case—implementation, enforcement, effectiveness, and institutional response—require factual development and expert evaluation. In the alternative, should the Court consider any materials outside the pleadings, Rule 12(d) mandates conversion to summary judgment and the provision of a reasonable opportunity for Plaintiff to conduct discovery and supplement the record. Villanova is not entitled to judgment at this stage, and the case should proceed in the ordinary course.

Respectfully Submitted,

**EDELSTEIN LAW, LLP**

_____
Jay L. Edelstein, Esquire