SAUL EWING LLP

James A. Keller
Phone: (215) 972-1964
Fax: (215) 972-4152
James.Keller@saul.com
www.saul.com

October 30, 2026

The Honorable Kai N. Scott
Room 13613, United States Courthouse
601 Market Street
Philadelphia, PA 19106

**Re:** ***C.A. v. Villanova University, et al.***
**Docket: 2:24-cv-04434-KNS**

Dear Judge Scott:

We represent Defendant Villanova University (the "University" or "Villanova") in the above-captioned matter. The Court has requested briefing on the issue of Defendant Juan Eguiguren's domicile at the time this matter was initiated, which is necessary to confirm that this Court has subject matter jurisdiction.

On the day this matter was initiated, Mr. Eguiguren was on an airplane, headed to commence his senior year at Villanova. He had no plausible intent to return to Ecuador after graduation: rather, every indication is that he was headed to the Commonwealth of Pennsylvania to reside indefinitely, with no fixed date for departure. And indeed, over the course of his senior year, he pursued employment, driving privileges, banking privileges, voting privileges, and a romantic relationship in Pennsylvania – not Ecuador. There is diversity of citizenship in this case, and the case is properly before this Court. Nobody questioned this issue for nearly two years – including Mr. Eguiguren.

Now, after two years of litigation, Mr. Eguiguren has decided to challenge this issue. He states in a self-serving, unsworn declaration: "Throughout my undergraduate enrollment at Villanova University, I considered my presence in Pennsylvania to be temporary and solely for the purpose of pursuing my undergraduate education," and it had "always been my intent to return home to Quito, Ecuador." Att. D at 7, 3. While Mr. Eguiguren may be living in Ecuador now, that return to Ecuador did not occur in a vacuum. It followed widespread public scrutiny of his alleged involvement in the sexual assault underlying this litigation—specifically, recording the assault without intervening—and the subsequent loss of his University housing and anticipated employment in the United States. Those intervening circumstances provide a far more plausible explanation for his departure than his present assertion that he always intended to return to Ecuador, and never established a domicile in Pennsylvania.

Mr. Eguiguren has unfortunately used his current presence in Ecuador to avoid having his account pressure-tested through live testimony, under oath. Att. H. His self-serving, unattested account should not be credited over the objective, common sense evidence contradicting it.

**Procedural Background**

The day after this matter was initiated, on August 23, 2024, Villanova asserted diversity jurisdiction and removed the case from the Court of Common Pleas for Philadelphia County to federal district court on a "snap" removal before any other defendant was served. ECF 1. Mr. Eguiguren did not contest this Court's jurisdiction over this matter, and nor did any other party, including the plaintiff, who presumably had a significant interest in seeing the matter returned to her chosen forum.

Nearly two years into the litigation, on July 15, 2026, counsel for Mr. Eguiguren submitted a letter to all counsel of record indicating, in advance of the parties' upcoming Rule 16 conference, and in connection with the parties' pre-conference preparation of a joint Rule 26 report, that he intended to assert that "diversity jurisdiction fails because Eguiguren is a United States citizen domiciled in Ecuador." Att. A.

At the Rule 16 conference, which was held on July 23, 2026, this Court ordered the parties to "undergo and complete by **September 8, 2026** jurisdictional discovery for the purpose of determining whether the Court has subject-matter jurisdiction over this action with respect to Defendant Juan Eguiguren's citizenship and domiciliary," in advance of a status conference to be held on September 10, 2026. ECF 110 (emphasis in original).

Counsel for Mr. Eguiguren circulated some limited documentation related to Mr. Eguiguren's ties to Ecuador on August 6, 2026. Att. B, C. Finding it insufficient, Villanova served Eguiguren with interrogatories and requests for production on August 11, 2026. By the time of the scheduled status conference, Mr. Eguiguren had submitted no responses or responsive documents, and the parties jointly requested that the status conference be rescheduled.

Mr. Eguiguren submitted responses to the University's first set of interrogatories and requests for production, as well as an unsworn declaration, on September 25, 2026. Att. D-G. The responses were untimely and incomplete. The parties met with the Court the following week for the rescheduled status conference, on October 7, 2026, and the Court authorized the issuance of additional limited discovery to Mr. Eguiguren, to be submitted by October 16, 2026 and responded to by October 23, 2026, with briefing to be submitted October 30, 2026. ECF 116.

The University timely submitted additional interrogatories to Mr. Eguiguren, who responded with an amended unsworn declaration; a dozen additional pages of documents, primarily consisting of text message and email screenshots which were translated by parties unknown into English and were redacted; and partial and unsatisfactory written responses to the second set of interrogatories. Att. I-K.

Of course, as noted, Mr. Eguiguren has declined to sit for a deposition and have his responses pressure-tested through live testimony, under oath. Att. H. Mr. Eguiguren points to the limitations of Ecuadorian law, but does not explain why he – a young man of apparent means who is neither in school nor working and, as an American citizen, can come and go as he pleases – could not make himself available here, including at the upcoming hearing scheduled for November 30, 2026.

Indeed, Mr. Eguiguren has traveled to the United States twice since returning to Ecuador after completing his degree at Villanova, entering May 17, 2025 and exiting June 22, 2025, and entering again August 20, 2026 and exiting August 30, 2026 – the precise time period when Villanova was awaiting responses to its August 11, 2026 discovery requests. Att. G, EGUIGUREN0015. Mr. Eguiguren has also traveled during this period throughout South America (March 04, 2026 through March 20, 2026), *id.*, and visited Spain and Italy. Att. E at 19. Although these records demonstrate his ability to travel internationally, he has not made himself available for examination under oath in the United States.

**Legal Background**

Diversity of citizenship must exist both when a state court complaint is filed and when the action is removed; the removing party bears the burden of establishing federal jurisdiction. *See In re Lipitor Antitrust Litigation*, 855 F.3d 126, 150-51 (3d Cir. 2017). For purposes of diversity jurisdiction, "only the American nationality of a dual national is recognized." *Frett-Smith v. Vanterpool*, 511 F.3d 396, 400 (3d Cir. 2008). An American citizen domiciled abroad cannot be sued in federal court based on diversity jurisdiction, as such individuals are neither "citizens of a State" nor "citizens or subjects of a foreign state." *See Swiger v. Allegheny Energy, Inc.*, 540 F.3d 179, 185 (3d Cir. 2008). Domicile is assessed based on the state of facts that existed at the time the litigation was commenced. *Grupo Dataflux v. Atlas Global Group, L.P.,* 541 U.S. 567, 571-72 (2004). Subsequent events cannot retroactively create or destroy diversity jurisdiction. *Id.*

For the purposes of establishing domicile, more than mere physical presence is required – but an intent to remain permanently in the jurisdiction is *not* required. *See Frett-Smith*, 511 F.3d at 401-02; *Krasnov v. Dinan*, 465 F.2d 1298, 1300 (3d Cir. 1972) ("[p]roof of intent to remain permanently is not the test"). Rather, "[a]n individual can change domicile instantly" by taking up residence in a new location with the intent to remain there indefinitely. *McCann v. Newman Irrevocable Tr.*, 458 F.3d 281, 286 (3d Cir. 2006). A change of domicile does not require residence of any particular duration, as "an individual's domicile changes instantly if he 'takes up residence at the new domicile' and 'intend[s] to remain there.'" *Washington v. Hovensa LLC*, 652 F.3d 340, 345 (3d Cir. 2011) (quoting *Krasnov*, 465 F.2d at 1300) (emphasis added).

In determining that intent, courts consider numerous factors, including "establishment of a home, place of employment, location of assets, registration of a car, and generally, the center of one's business, domestic, social and civic life." *Frett-Smith*, 511 F.3d at 401. Other relevant considerations include exercise of political rights, payment of taxes, banking relationships, a driver's license, and declarations of intent. *Krasnov*, 465 F.2d at 1301; *McCann*, 458 F.3d at 286.

A litigant's "'testimony as to his intention to establish a domicile, while entitled to full and fair consideration, is subject to the infirmity of any self-serving declaration, and it cannot prevail to establish domicile when it is contradicted or negatived by an inconsistent course of conduct.'" *Frett-Smith*, 511 F. 3d at 401 (citation omitted) (affirming rejection of sworn affidavit concerning domicile where the individual's assertions were contradicted by the objective evidence); *see also Korn v. Korn*, 398 F.2d 689, 691 (3d Cir.1968)("[A]ctions speak louder than words."). In assessing a self-serving affidavit, the Court must consider whether the affidavit is "buttressed" or "contradicted" by the person's "course of conduct." *Washington*, 652 F.3d at 347.

That an individual may contemplate one day departing their domicile is of no moment, so long as their residence at the relevant time was indefinite in nature. "[T]he possibility of eventually going elsewhere or even returning whence one came does not defeat the acquisition of a new domicile." *Gordon v. Steele*, 376 F. Supp. 575, 578 (W.D. Pa. 1974) (citing *Gallagher v. Philadelphia Transp. Co.*, 185 F.2d 543, 546 (3d Cir. 1950)) (student was a domiciliary of Idaho, where she intended to reside indefinitely, rented an apartment, belonged to a church, and hoped to marry, even though she acknowledged that "she may locate after graduation in any other of the 49 states or abroad" and returned home to Pennsylvania for school holidays, held a Pennsylvania driver's license and bank account).

Likewise, an individual's subsequent departure does not necessarily negate the original intention to establish domicile. *See Gordon,* 376 F. Supp. at 578 (quoting *Gallagher*, 185 F.2d at 546) (observing that an individual "may later have acquired doubts about remaining" in the new home, or "been called upon to leave it" and emphasizing that the relevant inquiry is the individual's intention when the domicile was established, rather than whether subsequent developments ultimately caused the individual to depart).

Although enrollment at a college or university does not automatically establish domicile in the state where the institution is located, a student may acquire a new domicile there by establishing residence accompanied by the requisite intent. *Gordon*, 376 F. Supp at 578; *see also Blue v. Nat'l Fuel Gas Distribution Corp.*, 437 F. Supp. 715, 718 (W.D. Pa. 1977), *aff'd*, 601 F.2d 573 (3d Cir. 1979) (graduate student established a new domicile because his objective conduct demonstrated an intent to remain indefinitely); *Doe v. Schwerzler*, No. 06–3529, 2008 WL 1781986, at *3 (D.N.J. Apr. 17, 2008) (finding that a college student established domicile in the state where she attended school based on her voter registration, driver's license, housing, banking relationships, and tax payments).

The standard of review for a determination of domicile for these purposes on appeal is clear error. *See Vaughn v. Vaughn*, 674 F. App'x 145 (3d Cir. Jan. 4, 2017). *See also Johnson v. SmithKline Beecham Corp.*, 724 F.3d 337, 345 (factual findings regarding domicile or citizenship reviewed for clear error).

**Statement of Facts**

This matter is properly in federal court, as Mr. Eguiguren was, at the time the litigation was initiated, a domiciliary of the Commonwealth of Pennsylvania. The University has appended the entirety of the materials received from Mr. Eguiguren in jurisdictional discovery, including his unsworn declarations, interrogatory responses, document productions, and correspondence. From that complete record, the University identifies below the facts which it submits support a finding that Mr. Eguiguren was domiciled in Pennsylvania when this litigation commenced and was removed, and that diversity jurisdiction is therefore proper. The undisputed facts which support this conclusion are as follows:

- Mr. Eguiguren is a citizen of the United States and of Ecuador. Att. B at ¶ 1.

- Mr. Eguiguren was born in the United States and, as such, is entitled to live, work, vote, and enjoy all other privileges of citizenship here. *Id.* at ¶ 2.

- Mr. Eguiguren was a student at Villanova University from August 2021, when he enrolled as a first year student, through April 2025, when he completed his undergraduate degree at the end of his senior year. *Id*. at ¶¶ 5, 18.

- During his college years, Mr. Eguiguren returned to Ecuador for summers and holidays. Att. G, EGUIGUREN0015-16.

- During the fall term of his junior year (2023), Mr. Eguiguren applied for a Project Manager Intern position at U.S.-based company SAS Institute Inc. ("SAS") for the following summer (2024). Att. E at 6.

- The summer intern position at SAS permitted Mr. Eguiguren to work remotely. *Id.* at 7.

- Mr. Eguiguren participated in the SAS internship from Ecuador for less than three months, while visiting family; from Maryland for ten days, while visiting his girlfriend ("Girlfriend 2"); from Cary, North Carolina for the final project presentation; and, upon his return to Villanova, **from Pennsylvania**. *Id*.

- Mr. Eguiguren worked remotely for SAS **from Pennsylvania** from August 23, 2024 until April 15, 2025, approximately eight months. *Id.*

- On September 27, 2024, SAS offered Mr. Eguiguren post-graduate employment, which he accepted; the offer was "for a Project Management position initially with a June 1, 2025 start date **and remote**" (emphasis added). *Id*. The official offer letter described the job location as "Remote **PA** (May consider relocation)" (emphasis added). Att. G, EGUIGUREN0025.

- On October 31, 2024, Mr. Eguiguren accepted permanent employment with SAS, following more than a month of considering whether to continue to work remotely for SAS, or to make a change to in-person employment, which would require him to relocate to Cary, North Carolina. As discussed further below, when specifically asked in discovery, Mr. Eguiguren refused to identify from where he had physically intended to work if he accepted the permanent position as a remote employee. Att. K, EGUIGUREN0039-44; Att. J at 8-9.

- However, we know that soon thereafter, on November 20, 2024, Mr. Eguiguren sought a Pennsylvania driver's license. Att. G, EGUIGUREN0008.

- Mr. Eguiguren also registered to vote in Pennsylvania on November 20, 2024; when his original voter registration application was rejected, he took steps to perfect it and successfully register. Att. G, EGUIGUREN0005-07.

- Mr. Eguiguren maintained a bank account in Pennsylvania throughout the entirety of his time at Villanova, and has never closed it – it remains open to this day. Att. E at 14.

- Mr. Eguiguren began a relationship with Girlfriend 2, an American woman with no known ties to Ecuador, during his junior year at Villanova and maintained the relationship through the end of his senior year. *Id.* at 11. The relationship was sufficiently serious that after Mr. Eguiguren returned to Ecuador following his junior year, he traveled to the United States to see her. *Id.* at 19.

- On April 13, 2025, Mr. Eguiguren was restricted from University housing due to safety concerns in the wake of a burst of media attention to the sexual assault underlying this litigation, which Mr. Eguiguren videotaped and did not intervene to stop. *See, e.g.,* V. Fiorillo, "Petition to Expel Villanova Student Juan Eguiguren Jumps 12,000 Signatures in One Day," PHILADELPHIA MAGAZINE (Apr. 8, 2025), *available online at* https://www.phillymag.com/news/2025/04/08/villanova-sexual-assault-juan-eguiguren/ (last accessed October 9, 2026).

- Just two days later, on April 15, 2025, Mr. Eguiguren's offer of employment with SAS was revoked, purportedly due to "shifting business priorities." Att. G, EGUIGUREN0023-24; Att. 7 at 7, Att. E at 15.

- Within weeks, in May 2025, Mr. Eguiguren's relationship with Girlfriend 2 ended. Att. E at 14.

- His education complete and his job and romantic prospects evaporated, Mr. Eguiguren returned to Ecuador on April 24, 2025. Att. G, EGUIGUREN0015.

- Since that time, Mr. Eguiguren has actively sought to leave Ecuador, including by:

    - Pursuing graduate education in Europe, having been admitted to two different programs at the University of Milan on May 27, 2026 and July 20, 2026, Att. E at 8, Att. G, EGUIGUREN0001-0004,[1] and

    - Pursuing employment **in Pennsylvania**, as recently as January 2026. Att. K, EGUIGUREN0052.

**Legal Analysis**

**I. Mr. Eguiguren's Objective Course of Conduct Supports Pennsylvania Domicile**

The totality of the evidence reflects that when Mr. Eguiguren returned to Villanova for his senior year in August 2024, he did not intend to return to Ecuador upon graduation. Rather, his course of conduct demonstrates that he did and intended to reside indefinitely in the Commonwealth of Pennsylvania while he sought permanent employment in the United States.

---

[1] Eguiguren represents that he has family in Italy, where he also studied abroad. Att. D at 5, Att. E at 19.

Specifically, at the relevant time, Mr. Eguiguren resided in Pennsylvania; worked for an American company from Pennsylvania (pursuing permanent employment with that company); banked in Pennsylvania; and maintained a serious romantic relationship with an American woman who also resided in Pennsylvania. He thereafter accepted permanent employment in the United States; registered to vote; and obtained a driver's license. These are precisely the types of "objective" considerations the Third Circuit has identified as relevant to determining domicile: an individual's home, employment, assets, driver's license, exercise of political rights, and the center of his domestic, social, and civic life. *See e.g.*, *Frett-Smith*, 511 F.3d at 401; *McCann*, 458 F.3d at 286.

To the extent that any of these affirmative steps occurred after this litigation commenced, the University does not suggest that these subsequent acts retroactively create diversity jurisdiction: rather, these actions corroborate that at the relevant time, Mr. Eguiguren's intention was to remain in Pennsylvania indefinitely, with no fixed date for departure, and that Mr. Eguiguren did not intend to return to Ecuador. Mr. Eguiguren did not need to secure permanent employment in Pennsylvania, or commit to remaining in Pennsylvania forever, in order to establish domicile there: "Proof of intent to remain permanently is not the test." *Krasnov*, 465 F.2d at 1300. And, Pennsylvania remained Mr. Eguiguren's domicile unless and until he established a new one – in this case, by returning to Ecuador. *McCann*, 458 F.3d at 286-87.

As noted, contemplating a return to a former domicile, or subsequently encountering circumstances requiring departure, does not negate the original intention to establish domicile. *Gordon,* 376 F. Supp. At 578 (quoting *Gallagher*, 185 F.2d at 546). Here, Mr. Eguiguren returned to Ecuador only after his prospects in the United States had effectively vanished amid substantial public scrutiny surrounding his involvement in the sexual assault underlying this litigation. He lost access to his University housing; just two days later, SAS revoked his anticipated employment; and finally, his long-term girlfriend ended their relationship. Those intervening developments provide an explanation for his departure without undermining his earlier intention to remain. Indeed, his continued pursuit of opportunities outside Ecuador, including graduate education in Europe and employment in Pennsylvania, further undermines his assertion that he always intended to make Ecuador his home. Att. E at 8, Att. G, EGUIGUREN0001-0004; Att. K, EGUIGUREN0052.

## II. Mr. Eguiguren's Self-Serving Declarations Are Contradicted by His Own Evidence

Mr. Eguiguren denies that he *ever* intended to remain in Pennsylvania. As noted, he is explicit in his unsworn declaration that it was always his "intent to return home to Quito, Ecuador" and that he "considered [his] presence in Pennsylvania to be temporary and solely for the purpose of pursuing [his] undergraduate education." Att. D at 7, 3. But, this is precisely the kind of self-serving declaration that cannot prevail when contradicted by the individual's objective course of conduct. *See Washington*, 652 F.3d at 346-47.

*Frett-Smith* is particularly instructive. 511 F. 3d at 401-02. There, the Third Circuit affirmed the district court's rejection of a sworn affidavit asserting an intention to establish domicile in Florida because the individual's objective course of conduct contradicted her statements of intent. *Id.* The court relied on the absence of objective connections such as tax payments, a driver's license, vehicle registration, or banking relationships, together with

inconsistencies in the submitted affidavits. *Id.* Here too, the Court should look beyond Mr. Eguiguren's declarations and evaluate them against the documentary evidence and his own inconsistent discovery responses.

For example, when asked an extremely straightforward question—why he accepted indefinite post-graduate employment in the United States if his plan was always to reside in Ecuador—Mr. Eguiguren responded:[2]

> "The fact that Defendant Eguiguren has always intended to return home to Ecuador is supported by his actual, documented, repeated return trips to Ecuador. It is consistent that he maintained that intent despite acceptance of post-graduation employment that never came to be, particularly when Defendant Eguiguren returned home to Ecuador."

Att. J at 11

This explanation does not withstand scrutiny. Mr. Eguiguren suggests that his intent to return to Ecuador after graduation is demonstrated by his visits to Ecuador *before* graduation and by his eventual return only *after* his anticipated American employment failed to materialize. Neither proposition addresses the critical question of whether, in August 2024, he intended to reside indefinitely in Pennsylvania.

Mr. Eguiguren's account is further undermined by numerous discrepancies between his discovery responses and his own documentation. Among other discrepancies:

- Mr. Eguiguren asserts that he sought to register to vote because he was interested in the 2024 United States presidential election, notwithstanding that he submitted his voter-registration application *weeks after that election had already occurred*. Att. J at 12.

- Mr. Eguiguren asserts that at the time litigation commenced, he "hoped that the position [at SAS] would be an in-person position in Cary, North Carolina, and did not hope or expect that the position would permit him to work remotely from Pennsylvania." *Id.* at 7. Yet, his own documentation reflects that months later, he was still considering whether to deviate from a remote-work arrangement expressly designated by SAS as "**Remote PA**." Att. G, EGUIGUREN0025 (emphasis added); Att. K, EGUIGUREN0039-44.

  - Crucially, as noted, when specifically asked to identify from where he was planning to work if his job with SAS remained remote, Mr. Eguiguren **refused to answer**. Att. J at 8-9 ("Defendant objects to subpart (a) to the extent it calls for speculation concerning a hypothetical remote-work arrangement that was not ultimately

[2] Attachment J, Mr. Eguiguren's responses to the University's second set of interrogatories, was without page numbers. For the sole purpose of facilitating the Court's review of the pertinent documentation in this matter, the University has added page numbers in red text in the lower right hand corner of that Attachment.

implemented….[Defendant] will not speculate about an arrangement that was never finalized”).

  - Along the same lines, Mr. Eguiguren asserts that he has applied to “about 200 jobs without success” since April 15, 2025, Att. E at 7, but declined to provide any specificity about his job search when asked,[3] other than acknowledging, upon being asked a second time,[4] that he has continued to pursue employment in Pennsylvania, as recently as January of this year. Att. J at 6; Att. K, EGUIGUREN0041.

- Incredibly, Mr. Eguiguren maintains that he never exchanged a *single* text or email with a friend, family member, his girlfriend, or an advisor about his post-graduate plans. *See* Att. J at 13-16.

Taken together, these discrepancies substantially undermine the credibility of Mr. Eguiguren’s *post hoc* characterization of his intentions. They also demonstrate why examination under oath would be particularly important in resolving the disputed factual question before the Court. Of course, Mr. Eguiguren cannot be asked to explain any of these discrepancies because he has not made himself available for a deposition and apparently does not intend to appear in Court for a hearing on November 30. The Court should therefore accord little weight to his untested assertions, particularly where contradicted by his own documentation and course of conduct.

## III. Mr. Eguiguren’s Refusal to Submit to a Deposition Further Undermines His Account

Mr. Eguiguren’s refusal to submit to deposition is particularly troubling given the nature of his jurisdictional challenge. In effect, he seeks to use his dual citizenship as both a sword and a shield—enjoying the privileges of American citizenship, including freely traveling to and from the United States, while invoking his Ecuadorian citizenship and the restrictions of Ecuadorian law to avoid examination under oath concerning the very facts upon which his challenge depends.

The Third Circuit has expressly recognized the inequity of permitting dual nationals to obtain an “advantage not enjoyed by native-born American citizens.” *Frett-Smith*, 511 F.3d at 400. The same concern is implicated here. Ecuadorian law may restrict depositions conducted in Ecuador, but it does not prevent Mr. Eguiguren from making himself available for a deposition in the United States, as his own travel history demonstrates he is amply capable of doing. Instead, he asks this Court to credit his self-serving declarations while declining to subject them to examination under oath. Given the objective evidence contradicting his account, the Court should accord those untested and unsworn declarations little weight.

## IV. Student-Domicile Authorities Support a Finding of Pennsylvania Domicile

The objective evidence supporting Mr. Eguiguren’s domicile in Pennsylvania is consistent with decisions recognizing that college students may establish domicile in the states where they attend school, notwithstanding continuing ties to their former homes. As discussed below, in determining whether a student has acquired a new domicile, courts look beyond the circumstances

[3] *See* Answer to Interrogatory 1 of Villanova’s First Set of Interrogatories (Att. E at 6-7).
[4] *See* Answer to Interrogatory 1 of Villanova’s Second Set of Interrogatories (Att. J at 6).

of college enrollment to the objective evidence of intent, including employment plans, voter registration, driving privileges, and banking relationships.

For example, in *Schwerzler*, the plaintiff was a student attending college in Kentucky when she brought suit in New Jersey in connection with alleged child sexual abuse she endured there. 2008 WL 1781986. Defendant contested diversity jurisdiction, asserting that plaintiff was a domiciliary of New Jersey, but the Court determined that although "'[i]t is generally presumed that a student who attends a university in a state other than the student's 'home' state intends to return 'home' upon completion of studies,'" the plaintiff was indeed a domiciliary of Kentucky. *Id.* at *2 (quoting *Bradley v. Zissimos*, 721 F.Supp.738, 739-740 (E.D. Pa. 1989)). The Court relied on the facts that the plaintiff had registered to vote in Kentucky; had a Kentucky driver's license; had leased property in Kentucky; had an open bank account in Kentucky; had paid utilities in Kentucky; and had paid Kentucky state income taxes. *Schwerzler*, 2008 WL 1781986 at *3.

Similarly, in *Naglak v. Berlin*, No. 87–3427, 1989 WL 114356 (E.D.Pa. Sept. 29, 1989), the plaintiff asserted that she was domiciled in Maryland, where she moved to attend college, rather than her previous place of domicile, Pennsylvania. In contesting diversity jurisdiction, the defendant asserted that college attendance and short term employment did not confer domicile, but merely residence. *Id.* at *2. The Court determined that the plaintiff "showed both a residential connection with the place in question and an expressed intent to remain there indefinitely," because she voted, paid taxes, paid rent and utility fees, banked, and had a driver's license in Maryland and, when not attending school, had "been employed in the same area and intend[ed] to seek employment in that area following her graduation." *Id.* As the Court noted, "even a student may change her domicile through a change in intent." *Id.* at *3.

Likewise, in *Reynolds v. Ranta*, 362 F.Supp. 333 (W.D.Pa. 1973), the court credited defendant's assertion that he – a student at The Pennsylvania State University – was a domiciliary of Pennsylvania, notwithstanding his continuing ties to Ohio and the plaintiff's assertion that Ohio was thus the appropriate domicile. The Court credited that the defendant voted, paid taxes, lived, and banked in Pennsylvania, even though he was on a leave of absence from his employer in Ohio, his parents lived in Ohio, his driver's license was in Ohio, his car was registered in Ohio, and he was registered for the draft in Ohio. *Id.* at 335.

By comparison, in *Park v. Tsiavos*, 165 F.Supp.3d 191 (D.N.J. 2016), *aff'd,* 679 F. App'x 120 (3d Circ. Feb. 9, 2017), the Court agreed with the defendant that the plaintiff's domicile was in New Jersey, where he grew up, and not New York, where he was attending college, and as such, there was no diversity jurisdiction. The *Park* Court determined that plaintiff had "neither rebutted the presumption in favor of New Jersey as his domicile, nor proved by a preponderance of evidence that he ha[d] changed his domicile to New York," as plaintiff was listed as a dependent on his parents' state tax refund; gave their address as his in connection with the underlying incident which led to the lawsuit; renewed his New Jersey license the same month he filed suit; and had not sought to get a driver's license, register to vote, or pay taxes in New York. *Id.* at 199.

Similarly, in *Bradley*, 721 F.Supp. 738, the plaintiff, who had rented an apartment in Southern New Jersey where he lived and received mail, was nonetheless determined to be a domiciliary of Pennsylvania, as he was originally from Pennsylvania; had gone to undergraduate school in Pennsylvania; was attending graduate school in Pennsylvania; paid taxes in

Pennsylvania; had a Pennsylvania driver's license; gave his permanent address to his graduate school as being in Pennsylvania; and stated that he intended to return to Pennsylvania. *Id.* at 739. The Court concluded: "Because it was Mr. Bradley's intention to live in New Jersey only temporarily, he is not a citizen of New Jersey, but of Pennsylvania." *Id.* at 740.

Here, Mr. Eguiguren is more closely situated to the students in *Schwerzler, Naglak,* and *Reynolds* than those in *Park* or *Bradley*. His ultimate return to Ecuador does not negate the intention reflected in that conduct. And, his self-serving declarations are undermined by his own documentation, his inconsistent discovery responses, and his refusal to make himself available for examination under oath despite demonstrated ability to return to this country.

For these reasons, the University respectfully submits that Mr. Eguiguren was domiciled in Pennsylvania when this litigation commenced and was removed, that diversity jurisdiction exists, and that this matter is properly before the Court.

Respectfully,

James A. Keller

Cc: Counsel of record

Encl. (1)

"Index of Attachments" follows next page

**<u>Index of Attachments</u>**

Attachment A: Eguiguren Letter Raising Subject Matter Jurisdiction Issue (dated July 15, 2026)

Attachment B: Eguiguren Voluntary Disclosures Regarding Domicile (dated Aug. 06, 2026)

Attachment C: Attachments to Voluntary Disclosures Regarding Domicile (Att. B)

Attachment D: Eguiguren Unsworn Declaration (dated Sept. 25, 2026)

Attachment E: Eguiguren Responses to First Set of Interrogatories (dated Sept. 25, 2026)

Attachment F: Eguiguren Responses to First Set of Requests for Production (dated Sept. 25, 2026)

Attachment G: Attachments to Responses to First Set of Requests for Production (Att. F – EGUIGUREN0001-35)

Attachment H: Eguiguren Letter Regarding Deposition (dated Oct. 08, 2026)

Attachment I: Eguiguren Unsworn Declaration – Amended (dated Oct. 23, 2026)

Attachment J: Eguiguren Responses to Second Set of Interrogatories (dated Oct. 23, 2026)

Attachment K: Attachments to Responses to Second Set of Interrogatories (Att. J – EGUIGUREN0036-52)