**UNITED STATES DISTRICT COURT FOR THE**
**EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| **C.A.**<br><br>Plaintiff,<br><br>v.<br><br>**VILLANOVA UNIVERSITY, et al.**<br><br>Defendants. | **No.: 2:24-cv-04434-KNS** |

**ORDER**

AND NOW, this ___ day of __________, 2026, upon consideration of Defendant Juan Eguiguren's Motion to Remand (ECF No. 117), the responses thereto, the jurisdictional discovery conducted by the parties, and the record before the Court, it is hereby **ORDERED** that Defendant Juan Eguiguren's Motion to Remand is **GRANTED**.

It is further **ORDERED** that this action is **REMANDED** to the Court of Common Pleas of Philadelphia County, Pennsylvania.

The Clerk of Court shall transmit a certified copy of this Order to the Prothonotary of the Court of Common Pleas of Philadelphia County and shall mark this matter **CLOSED**.

**BY THE COURT:**

______________________________
Honorable Kai N. Scott

**UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| **C.A.**<br><br>Plaintiff,<br><br>v.<br><br>**VILLANOVA UNIVERSITY, et al.**<br><br>Defendants. | **No.: 2:24-cv-04434-KNS** |

**PLAINTIFF'S BRIEF IN SUPPORT OF DEFENDANT JUAN EGUIGUREN'S MOTION TO REMAND**

Plaintiff, C.A. by and through her attorneys, Jay L. Edelstein, Esquire, Stephen J. Pokiniewski, Esquire, and Edelstein Law, LLP, respectfully submits this Brief in Support of Defendant Juan Eguiguren's Motion to Remand.

Respectfully Submitted,

**EDELSTEIN LAW, LLP**

Jay L. Edelstein, Esquire
ID No. 30227
230 S. Broad Street, Suite 900
Philadelphia, PA 19102
(215) 893-9311
JEdelstein@edelsteinlaw.com

# TABLE OF CONTENTS

I. INTRODUCTION 1

II FACTUAL AND PROCEDURAL HISTORY ........................................................... 1

A. FACTUAL BACKGROUND ........................................................................... 1

B. PROCEDURAL HISTORY RELEVANT TO SUBJECT-MATTER JURISDICTION ......................................................................................... 2

III. VILLANOVA BEARS THE BURDEN OF ESTABLISHING DIVERSITY JURISDICTION ........................................................................................... 4

IV. ARGUMENT ............................................................................................... 7

A. THE JURISDICTIONAL RECORD ESTABLISHES THAT ECUADOR REMAINED EGUIGUREN'S DOMICILE WHEN THIS ACTION COMMENCED ....................................................................................... 7

B. EGUIGUREN'S PRESENCE AT VILLANOVA WAS TEMPORARY AND EDUCATIONAL, NOT A CHANGE OF DOMICILE ..................................... 11

C. VILLANOVA CANNOT IDENTIFY ANY STATE THAT EGUIGUREN HAD ADOPTED AS HIS DOMICILE WHEN THIS ACTION COMMENCED ....... 15

D. THE EVIDENCE VILLANOVA MAY RELY UPON DOES NOT ESTABLISH THAT EGUIGUREN HAD ACQUIRED DOMICILE IN ANY U.S. STATE WHEN THIS ACTION COMMENCED ........................................................... 17

1. The Post-Commencement SAS Offer Establishes Neither Pennsylvania Nor North Carolina Domicile ..................................................................... 18

2. Villanova Cannot Rely on a Pennsylvania Driver's License Obtained Months After Commencement to Prove Eguiguren's Earlier Domicile ..................... 20

3. Villanova Cannot Rely on Later Pennsylvania Voter Registration When Eguiguren Never Voted in Pennsylvania and Continued Exercising His Ecuadorian Political Rights ............................................................... 21

4. Eguiguren's Pre-Suit Change of His Ecuadorian Polling Location to New Jersey Did Not Establish an Intent to Make Pennsylvania His Home ............................................................................................................ 22

5. A Villanova-Area Bank Account Does Not Establish That Pennsylvania Became Eguiguren's Indefinite Home ......................................................... 23

6. Eguiguren's Relationship With a Maryland Resident Does Not Establish

Pennsylvania Domicile ........ 24

7. If Eguiguren's Villanova Residence Made Him a Pennsylvania Domiciliary, Then C.A.'s Villanova Residence Undermines Complete Diversity for Similar Reasons ........ 25

E. EGUIGUREN'S ECUADOR DOMICILE DEFEATS DIVERSITY JURISDICTION ........ 25

F. REMAND RETURNS THIS ACTION TO THE PHILADELPHIA COURT OF COMMON PLEAS ........ 27

V. CONCLUSION ........ 28

# TABLE OF AUTHORITIES

**Cases**

*AlliedSignal Recovery Tr. v. AlliedSignal, Inc.*,
298 F.3d 263 (3d Cir. 2002) ............................................................ 27

*Areces Coma v. Oliva de Cuebas*,
356 F. Supp. 3d 198 (D.P.R. 2019) ............................................ 12–13, 16, 18, 20, 24

*Atl. Marine Constr. Co. v. U.S. Dist. Ct. for W. Dist. of Tex.*,
571 U.S. 49 (2013) ............................................................ 28

*Bloom v. Barry*,
755 F.2d 356 (3d Cir. 1985) ............................................................ 27

*Blue v. Nat'l Fuel Gas Distrib. Corp.*,
437 F. Supp. 715 (W.D. Pa. 1977) ............................................................ 14–15

*Bradley v. Zissimos*,
721 F. Supp. 738 (E.D. Pa. 1989) ............................................................ 11

*Freidrich v. Davis*,
767 F.3d 374 (3d Cir. 2014) ............................................ 6, 9–10, 20–21, 24, 26–27

*Frett-Smith v. Vanterpool*,
511 F.3d 396 (3d Cir. 2008) ............................................................ 27

*García Pérez v. Santaella*,
364 F.3d 348 (1st Cir. 2004) ............................................................ 12, 18

*Gordon v. Steele*,
376 F. Supp. 575 (W.D. Pa. 1974) ............................................................ 15

*Hain Celestial Grp., Inc. v. Palmquist*,
607 U.S. 421 (2026) ............................................................ 28

*Jimenez-Franceschini v. Bentley*,
867 F. Supp. 2d 276 (D.P.R. 2012) ............................................................ 12

*Krasnov v. Dinan*,
465 F.2d 1298 (3d Cir. 1972) ............................................................ 4, 11

*Lincoln Benefit Life Co. v. AEI Life, LLC*,
800 F.3d 99 (3d Cir. 2015) ............................................................ 25

*McCann v. Newman Irrevocable Tr.*,
458 F.3d 281 (3d Cir. 2006) .......................................................... 4–6, 10–11, 16, 20, 22, 24–25

*Mitchell v. United States*,
88 U.S. (21 Wall.) 350 (1874) ........................................................................................ 5

*Newman-Green, Inc. v. Alfonzo-Larrain*,
490 U.S. 826 (1989) ........................................................................................... 2, 26–27

*Park v. Tsiavos*,
165 F. Supp. 3d 191 (D.N.J. 2016) ................................................................... 11–12, 15

*Santiago-Colberg v. Busquets*,
755 F. Supp. 3d 147 (D.P.R. 2024) ................................................................................ 13

*Swiger v. Allegheny Energy, Inc.*,
540 F.3d 179 (3d Cir. 2008) ............................................................................... 2, 26–27

*Zambelli Fireworks Mfg. Co. v. Wood*,
592 F.3d 412 (3d Cir. 2010) ............................................................................................ 25

**Statutes**

28 U.S.C. § 1332 .......................................................................................... 2, 4, 25–28
28 U.S.C. § 1447(c)–(d) ................................................................................................. 27

**Federal Rules of Civil Procedure**

Fed. R. Civ. P. 16 ............................................................................................................ 2
Fed. R. Civ. P. 26(f) ...................................................................................................... 1–2

# I. INTRODUCTION

C.A. filed this state-law action in the Philadelphia Court of Common Pleas on August 22, 2024. Villanova University removed it the following day based on diversity jurisdiction. ECF No. 1. During the parties' Rule 26(f) process, Defendant Juan Eguiguren raised a threshold jurisdictional issue: he is a dual citizen of the United States and Ecuador and maintains that, when this action commenced, his domicile was Ecuador. The Court permitted jurisdictional discovery, and Villanova pursued discovery directed specifically to that question.

There is a story behind where Eguiguren's home was when this case began. It is his story to tell, not C.A.'s. His declaration, verified discovery responses, documents, and travel history tell it. They describe where he was raised, where he repeatedly returned, where he exercised political rights, where he maintained his home and financial ties, and what brought him to Pennsylvania.

C.A.'s role is narrower. Villanova invoked this Court's diversity jurisdiction and bears the burden of establishing it. The jurisdictional record does not establish that Pennsylvania displaced Ecuador as Eguiguren's domicile before this action commenced. If Eguiguren remained domiciled in Ecuador, controlling Supreme Court and Third Circuit law requires remand.

# II. FACTUAL AND PROCEDURAL HISTORY

## A. FACTUAL BACKGROUND

This action arises from the events of August 24 and 25, 2022, during the beginning of the academic year at Villanova University. On the evening of August 24, Plaintiff C.A., then a Villanova student, attended student gatherings associated with "Sylly Night" at the College Hall Apartments, commonly known as "The Courts." Plaintiff became highly intoxicated and later returned to Villanova's campus, where she went to the dormitory room of Defendant Elijah Katzenell in Sheehan Hall. After consuming additional alcohol, Plaintiff lost consciousness. She

awoke the following afternoon in her own dormitory room wearing a shirt that was not hers and without underwear.

Katzenell was subsequently charged criminally and pleaded guilty to Sexual Assault in the Delaware County Court of Common Pleas. A consent search of Defendant Juan Eguiguren's cellular telephone recovered a video depicting Katzenell engaging in sexual intercourse with Plaintiff while she was unconscious. Plaintiff's Second Amended Complaint asserts claims against Villanova arising from its alleged failures to warn and protect its students and a civil-conspiracy claim against Eguiguren based upon his conduct surrounding the assault. See Second Amended Complaint, ECF No. 21.

### B. PROCEDURAL HISTORY RELEVANT TO SUBJECT-MATTER JURISDICTION

Plaintiff commenced this action in the Philadelphia Court of Common Pleas on August 22, 2024. Villanova removed the action to this Court the following day, invoking diversity jurisdiction under 28 U.S.C. § 1332. ECF No. 1. Following pleading-stage motion practice, the case proceeded toward fact discovery.

The present jurisdictional issue arose in connection with the parties' Rule 26(f) process and the Court's Rule 16 conference. The parties conducted their Rule 26(f) conference on July 7, 2026 and filed their Report of Rule 26(f) Meeting on July 17, 2026. ECF No. 108. In the Report, Defendant Eguiguren expressly contested subject-matter jurisdiction, stating that he is a dual citizen of the United States and Ecuador and is domiciled in Ecuador. The Report further identified the resulting issue under *Newman-Green, Inc. v. Alfonzo-Larrain* and *Swiger v. Allegheny Energy, Inc.*, and attached Eguiguren's passports. ECF No. 108.

The Court addressed the jurisdictional issue at the July 23, 2026 Rule 16 conference. That same day, the Court ordered the parties to conduct jurisdictional discovery directed specifically to

Eguiguren's citizenship and domicile. ECF No. 110. The Court initially directed that jurisdictional discovery be completed by September 8, 2026 and scheduled a status conference for September 10, 2026. *Id.*

Villanova thereafter served written discovery concerning Eguiguren's domicile. Eguiguren responded with verified interrogatory answers, responses to requests for production, supporting documents, and an unsworn declaration addressing his residence, education, travel, employment, voting history, financial accounts, identification, family ties, and other circumstances bearing on domicile.

It is important to note that although technically "unsworn," Eguiguren's declaration was executed under penalty of perjury and therefore has the same force and effect as a sworn declaration under 28 U.S.C. § 1746. **A deposition could not simply be conducted in Ecuador because Ecuador does not permit foreign litigants to take voluntary depositions on Ecuadorian soil**; that limitation arises from Ecuadorian sovereignty and law, not from any refusal by Eguiguren to provide evidence.

On September 3, 2026, Villanova moved to continue the scheduled status conference to permit additional time to complete the jurisdictional discovery and confer regarding the issue. ECF No. 112. The Court granted the request and rescheduled the conference for October 7, 2026. ECF Nos. 113–115. Following the October status conference, the Court permitted Villanova to serve a limited additional set of interrogatories upon Eguiguren concerning domicile. ECF No. 116. The Court directed Villanova to serve those interrogatories by October 16, 2026, Eguiguren to respond by October 23, 2026, and all parties submitting briefs concerning remand to do so by October 30, 2026. *Id.*

Eguiguren filed his Motion to Remand on October 14, 2026. ECF No. 117. The Court has

scheduled oral argument on that motion for November 30, 2026. ECF No. 118. Plaintiff submits this Response in support of Eguiguren's motion based upon the jurisdictional record developed pursuant to the Court's orders.

## III. VILLANOVA BEARS THE BURDEN OF ESTABLISHING DIVERSITY JURISDICTION

The jurisdictional burden rests with Villanova. Villanova removed this action on the basis of diversity jurisdiction and therefore bears the ultimate burden of establishing the jurisdictional facts by a preponderance of the evidence. *McCann v. Newman Irrevocable Trust*, 458 F.3d 281, 286, 289–90 (3d Cir. 2006). That burden includes establishing Eguiguren's citizenship for purposes of 28 U.S.C. § 1332. It does not shift to Eguiguren merely because he has challenged subject-matter jurisdiction or identified evidence that his domicile was outside Pennsylvania.

The Third Circuit's decision in *McCann* supplies the controlling framework. There, the estate of William McCann invoked diversity jurisdiction and contended that McCann had changed his domicile from New Jersey to New Hampshire before his death. The defendants disputed that jurisdictional allegation. The district court dismissed the action after concluding that the estate had failed to prove the asserted change of domicile by clear and convincing evidence. *Id.* at 285–86. The Third Circuit vacated, not because the proponent of jurisdiction was relieved of the burden of proving domicile, but because the district court had applied too demanding a standard of proof. The Court held unequivocally that "[t]he party asserting diversity jurisdiction bears the burden of proof" and ordinarily must establish diversity "by a preponderance of the evidence." *Id.* at 286.

*McCann* also identifies what must be proven. Citizenship for diversity purposes is synonymous with domicile, and **domicile is the individual's "true, fixed and permanent home and place of habitation"**—the place to which the person intends to return when absent. *Id.*

(emphasis added). The inquiry therefore requires more than showing where an individual happened to reside at a particular moment. **To acquire a new domicile, "[h]e must take up residence at the new domicile, and he must intend to remain there."** *Id.* at 286–87 (quoting *Krasnov v. Dinan*, 465 F.2d 1298, 1300 (3d Cir. 1972)) (emphasis added). **Both elements must exist.** Physical presence without the required intent does not establish a new domicile.

The rule permits a domicile to change quickly, but it does not presume that a change occurred merely because a person moved. *McCann* expressly recognized that "[a]n individual can change domicile instantly," while emphasizing that residence and intent must coincide. *Id.* at 286. Conversely, "[a] domicile once acquired is presumed to continue until it is shown to have been changed." *Id.* at 286–87 (quoting *Mitchell v. United States*, 88 U.S. (21 Wall.) 350, 353 (1874)). Thus, where a party has an established domicile and later resides somewhere else, the relevant question is whether the evidence establishes that the later residence was accompanied by an intent to make the new place home for an indefinite period.

The presumption of continuing domicile does not alter Villanova's ultimate burden of persuasion. *McCann* carefully distinguished the burden of production from the burden of persuasion. The presumption favoring an established domicile initially requires the party asserting a change to produce sufficient evidence of a new domicile. But even if sufficient contrary evidence is produced and the presumption drops from the case, "the burden of persuasion . . . remains throughout with the proponent of federal jurisdiction." *Id.* at 288. The Third Circuit explained:

> [T]he presumption favoring an established domicile places the burden of production on the party alleging a change in domicile, but does not affect the burden of persuasion, which remains throughout with the proponent of federal jurisdiction.

*Id.*

The same rule applies when the proponent of federal jurisdiction is itself asserting that an

established domicile changed. In that circumstance, *McCann* held that the jurisdictional proponent must first produce evidence sufficient to overcome the continuing-domicile presumption and then "carry the burden of persuasion by proving that a change of domicile occurred, creating diversity of citizenship." *Id.* at 289. The governing standard remains a preponderance of the evidence. *Id.* at 289–90. Thus, the presumption does not impose a clear-and-convincing standard on Villanova, but neither does it relieve Villanova of proving the asserted Pennsylvania domicile.

The Third Circuit applied this framework again in *Freidrich v. Davis*, 767 F.3d 374 (3d Cir. 2014). There, the plaintiff invoked diversity jurisdiction on the premise that the defendant remained domiciled in Pennsylvania. The defendant contended that he had become domiciled in Germany. After limited jurisdictional discovery and an evidentiary hearing, the district court found a German domicile and dismissed the case for lack of subject-matter jurisdiction. *Id.* at 375–76. The Third Circuit affirmed. It reiterated that "[t]he party asserting diversity jurisdiction bears the burden of proof" and must prove diversity by a preponderance of the evidence. *Id.* at 377.

That approach follows directly from *McCann*. The domicile inquiry considers the totality of the objective circumstances, including an individual's declarations, exercise of political rights, payment of personal taxes, house of residence, place of business, bank accounts, location of family, organizational memberships, driver's license, and vehicle registration. *McCann*, 458 F.3d at 286. No one factor is dispositive. The ultimate question remains whether the evidence demonstrates both residence and an intent to make the asserted jurisdiction the individual's home.

Accordingly, the issue before the Court is not whether Eguiguren was physically present in Pennsylvania while attending Villanova. The issue is whether Villanova has carried its burden of proving that, by the time this action commenced, Eguiguren had abandoned his established Ecuador domicile and acquired domicile in Pennsylvania or another State. As discussed below, the

jurisdictional discovery does not establish that change.

## IV. ARGUMENT

### A. THE JURISDICTIONAL RECORD ESTABLISHES THAT ECUADOR REMAINED EGUIGUREN'S DOMICILE WHEN THIS ACTION COMMENCED

The jurisdictional discovery confirms that Ecuador was Eguiguren's home when this action commenced. This is not a case in which domicile depends principally upon a litigant's present declaration of subjective intent. Long before this litigation arose, Eguiguren's residence, family home, civic participation, financial ties, and repeated conduct centered on Quito, Ecuador. The discovery Villanova requested does not materially alter that record.

Eguiguren was born in Orlando, Florida in November 2002, but moved with his family to their home in Quito in 2003 and was raised there. He completed his secondary education in Quito in June 2021, and his diploma is registered with Ecuador's Ministry of Education. Before leaving for Villanova, he had lived in Ecuador continuously for nearly four years except for a five-day trip to Uruguay. Ex. A (Eguiguren Decl.) ¶¶ 4–6, 15–16, 20–21. Thus, by the time Eguiguren reached adulthood and before he ever attended Villanova, Quito was not merely a family connection or a place he occasionally visited. It was where he had been raised, educated, and living.

His objective financial and civic ties pointed in the same direction. Eguiguren opened a Banco Pichincha account in Quito in 2020, before attending Villanova, and maintained that account thereafter. *Id.* ¶ 10. When he turned eighteen in November 2020, he registered to vote in Ecuador. *Id.* ¶ 11. He voted in person in Quito in the February 7 and April 11, 2021 Ecuadorian elections, before enrolling at Villanova, and again in Ecuadorian elections on August 20 and October 15, 2023 while he was a Villanova student. *Id.* ¶¶ 12–14, 30, 33. Villanova's jurisdictional discovery therefore revealed a sustained exercise of political rights in Ecuador, not merely

possession of Ecuadorian citizenship or identification.

Eguiguren also maintained formal identification issued by Ecuador. He received an Ecuadorian national identity card and Ecuadorian passport on June 1, 2021, shortly before beginning college, while also holding a United States passport consistent with his dual citizenship. *Id.* ¶¶ 17–19. Those documents do not themselves establish domicile. They are nevertheless part of the broader objective record showing that, before Eguiguren ever arrived at Villanova, his residence, civic participation, and financial life were centered in Ecuador.

The events immediately preceding commencement of this action are particularly probative. Eguiguren returned to Ecuador on May 21, 2024 for the summer. *Id.* ¶ 38. From approximately late May through early August 2024, he performed his SAS Institute internship remotely from his home in Ecuador. *Id.* ¶ 39; Eguiguren Answers to Villanova's First Set of Interrogatories ("1st Interrog. Ans."), No. 1. His two departures from Ecuador during that period were discrete and temporary. From June 18 through June 28, 2024, he traveled to Maryland to visit his then-girlfriend and then returned to Ecuador. Ex C (1st Interrog Ans.) No. 14. From July 30 through August 3, 2024, he traveled to Cary, North Carolina to present his final internship project and again returned to Ecuador. *Id.* No. 15. Villanova's discovery thus establishes that, during the summer immediately preceding this action, Eguiguren was not remaining in Pennsylvania between academic years or establishing a residence elsewhere in the United States. He was living and working from his family home in Quito.

That chronology continued through the jurisdictionally relevant date. On August 22, 2024—the date this action commenced—Eguiguren departed Quito for the United States to begin his senior year at Villanova. He flew from Quito to Bogotá that evening, connected to New York, and did not arrive in the United States or Pennsylvania until August 23, 2024. Ex. B (Am.

Eguiguren Decl.) ¶ 3; Ex. F (Supplemental Production) at EGUIGUREN0036–0038. Thus, the trip that returned Eguiguren to Villanova for his final academic year had not even brought him back to Pennsylvania when this action commenced. It followed a summer spent living and working from his family home in Quito and two short trips to the United States, each followed by a return to Ecuador. That objective sequence accords with Eguiguren's declaration that he regarded Quito as his home. Whatever post-graduation opportunities might later arise, his conduct through the commencement of this action repeatedly returned him to Ecuador, and the record identifies no State that he had then adopted as a new domicile.

The Third Circuit's analysis in *Freidrich v. Davis*, 767 F.3d 374 (3d Cir. 2014), illustrates why that objective record matters. *Freidrich* arose from a personal-injury action filed in the Eastern District of Pennsylvania on the premise that the defendant, Thomas Davis, remained a Pennsylvania citizen. Davis was an American citizen born in Pennsylvania who had moved to Germany years earlier. After limited jurisdictional discovery and an evidentiary hearing, the district court found that Davis was domiciled in Germany and dismissed the action for lack of subject-matter jurisdiction. *Id.* at 375–77. The Third Circuit affirmed. *Id.* at 379.

The facts in *Freidrich* were not one-sided. Davis retained meaningful connections to Pennsylvania. He held a Pennsylvania driver's license listing a Pennsylvania address, maintained a Pennsylvania bank account, retained an American retirement account, and continued to exercise federal political rights in the United States. *Id.* at 376–79. Those ties nevertheless did not overcome the broader objective record. Davis lived with his family in Germany, owned a home there, operated his business there, filed tax returns using his German address, and testified that Germany was where he intended to remain. *Id.* at 376–79. The Third Circuit emphasized that the domicile determination turned on the weight of the objective evidence, not the existence of isolated

connections to the United States:

> The vast majority of the other objective evidence in the record—evidence based upon more than mere statements of his intent—points to Germany as Davis' 'true, fixed and permanent home and place of habitation.'

*Id.* at 379 (quoting *McCann v. Newman Irrevocable Trust*, 458 F.3d 281, 286 (3d Cir. 2006)).

The same mode of analysis favors Ecuador here. Eguiguren's claim of Ecuador domicile does not rest on a recently adopted litigation position. The objective evidence predates this lawsuit by years: his upbringing and schooling in Quito, Ecuadorian bank account, Ecuadorian identification, Ecuadorian voter registration, and repeated exercise of Ecuadorian political rights. Immediately before this action commenced, he returned to Quito, lived there for the summer, worked there, returned there after both of his brief trips to the United States, and departed from Quito only to begin his final year at Villanova. Ex. A (Eguiguren Decl.) ¶¶ 3–21, 30, 33, 38–40; Ex. B (Am. Eguiguren Decl.) ¶ 3; Ex. C (First Interrog. Answers) Nos. 1, 14–15.

The jurisdictional discovery also confirms that Eguiguren continued to regard the Quito family residence as his home while he was away. Some of his personal belongings remained there throughout college; there was never a time when all of his belongings were located at Villanova or elsewhere in Pennsylvania. Ex C (1st Interrog Ans.) No. 9. Although the legal significance of his university residence is addressed separately below, this evidence independently corroborates the continued existence of a home in Ecuador rather than an abandonment of it.

Villanova therefore did not uncover a break in the factual continuity of Eguiguren's Ecuador domicile before this action commenced. To the contrary, the discovery supplied additional objective evidence supporting it. As in *Freidrich*, the proper focus is not whether some connection to the United States can be identified. It is where the record, considered as a whole, shows Eguiguren's actual home to have been. As of commencement, that record points to Quito,

Ecuador—and nowhere else.

### B. EGUIGUREN'S PRESENCE AT VILLANOVA WAS TEMPORARY AND EDUCATIONAL, NOT A CHANGE OF DOMICILE

Eguiguren's presence in Pennsylvania was attributable to his enrollment at Villanova, and that circumstance does not by itself establish Pennsylvania domicile. Federal courts distinguish between residence undertaken for the finite purpose of attending school and residence accompanied by an intent to make the forum one's home for an indefinite period. The cases applying that distinction consistently require evidence beyond attendance, student housing, and the ordinary incidents of college life.

The District of New Jersey applied the Third Circuit's domicile framework to precisely that issue in *Park v. Tsiavos*, 165 F. Supp. 3d 191 (D.N.J. 2016). There, the plaintiff's federal claim had been dismissed on summary judgment, leaving only state-law claims. Before determining whether to exercise supplemental jurisdiction, the court addressed whether diversity independently supported subject-matter jurisdiction. *Id.* at 198–99. The plaintiff had grown up in New Jersey but was attending college in Syracuse, New York when the action was filed. He contended that New York had become his domicile and stated that, after graduation, he intended to pursue a marketing career in New York City. *Id.* at 199–200.

The court rejected that contention. Applying *Krasnov* and *McCann*, it concluded that the **plaintiff's college residence and stated career aspiration did not establish that New York had displaced New Jersey as his domicile**. *Id.* The court relied upon the continued objective ties to New Jersey and expressly cited the Eastern District of Pennsylvania's student-domicile rule in *Bradley v. Zissimos*, 721 F. Supp. 738, 740 (E.D. Pa. 1989):

> It is generally presumed that a student who attends a university in a state other than the student's 'home' state intends to return 'home' upon completion of studies.

*Park*, 165 F. Supp. 3d at 200 (quoting *Bradley*, 721 F. Supp. at 740).

*Park* does not establish an irrebuttable rule that a college student can never acquire a new domicile where the student attends school. It establishes the more limited and relevant point that **attendance at an out-of-state university does not itself demonstrate the intent necessary to abandon an established domicile**. The student's physical presence must be accompanied by objective evidence showing that the college state has become home for an indefinite period. *Id.* at 199–200.

That distinction is even more explicit in *Areces Coma v. Oliva de Cuebas*, 356 F. Supp. 3d 198 (D.P.R. 2019). There, a Puerto Rico domiciliary attended Lynn University in Florida for four years and was physically present in Florida when she filed a diversity action. *Id.* at 201. During college, she lived in campus housing and opened a Florida bank account. She also testified that she wanted to remain in the continental United States rather than return to Puerto Rico. *Id.* Yet the court dismissed for lack of diversity, finding that she had not established Florida domicile. *Id.* at 203–05.

The court explained that there is an "established principle that out-of-state college students are not domiciliaries of the state in which they go to school." *Id.* at 203 (quoting *García Pérez v. Santaella*, 364 F.3d 348, 354 (1st Cir. 2004)). The reason is practical rather than categorical. Students are physically present where they attend school, but "the intent to remain requirement is often lacking" because their post-graduation plans remain uncertain. *Id.* (quoting *Jimenez-Franceschini v. Bentley*, 867 F. Supp. 2d 276, 280–81 (D.P.R. 2012)). A student may establish a new domicile, but doing so requires evidence demonstrating a genuine intention to remain in that particular jurisdiction beyond the temporary educational purpose that brought the student there. *Id.*

The facts in *Areces Coma* are instructive because the student had contacts with Florida that went beyond mere classroom attendance. She lived there throughout the academic year, maintained a Florida bank account, and professed an intention not to return to Puerto Rico. *Id.* at 201. The court nevertheless held those facts insufficient because the broader record did not demonstrate that Florida had become her indefinite home. *Id.* at 203–05. Her presence remained tied to her education and her future plans lacked the concrete connection to Florida necessary to establish a new domicile. *Id.*

*Santiago-Colberg v. Busquets*, 755 F. Supp. 3d 147 (D.P.R. 2024), provides an even stronger illustration. There, the district court reviewed a magistrate judge's recommendation that diversity was lacking because a medical student remained domiciled in Puerto Rico rather than Illinois. *Id.* at 151–52. The student was physically living in Chicago when suit was filed and had signed a one-year apartment lease, paid utilities, and purchased renter's insurance. *Id.* at 151–53. Those were substantial residential ties—considerably more than residence in university housing. The court nonetheless held that he remained domiciled in Puerto Rico because his Chicago residence was tied to a temporary medical rotation and did not demonstrate an intent to remain indefinitely. Id. at 153–56.

Eguiguren's connection to Pennsylvania at the relevant time was more closely tied to Villanova than the connections found insufficient in *Areces Coma* and *Santiago-Colberg*. During each academic year, he lived in university housing. He resided in Stanford Hall during freshman year, Sheehan Hall during sophomore year, Friar Hall during junior year, and Canon Hall during senior year. Ex. A (Eguiguren Decl.) ¶¶ 23, 26, 32, 42. He did not establish an independent Pennsylvania household. He did not purchase or lease a Pennsylvania residence apart from the housing supplied through his university attendance. His presence followed the academic calendar,

and when an academic year ended, the belongings he did not take with him were placed in storage for retrieval the following semester. Ex C (1st Interrog Ans.) No. 9. Those circumstances describe student residence, not the establishment of a permanent home.

Nor does Eguiguren's participation in ordinary university activities materially change that conclusion. He participated in Villanova's work-study program as a Student Philanthropy Associate and Student Catering Waitstaff. Ex C (1st Interrog Ans.) No. 1. Those positions arose from his status as an undergraduate and were connected to the institution he was attending. They do not resemble independent employment tying him to Pennsylvania apart from Villanova.

The cases finding that a student actually **did** acquire a new domicile underscore the distinction. In *Blue v. National Fuel Gas Distribution Corp.*, 437 F. Supp. 715 (W.D. Pa. 1977), the plaintiff had been domiciled in Pennsylvania before moving to New Jersey. He did not move merely to attend school. He accepted employment as a resident director at Glassboro State College, worked there throughout the year, later enrolled as a graduate student, moved all of his personal property to New Jersey, paid New Jersey income taxes, opened New Jersey bank accounts, obtained a New Jersey driver's license, registered his automobile there, joined a New Jersey church, developed significant personal ties there, and stated that he intended to remain in New Jersey indefinitely. *Id.* at 716–18.

On that record, the court concluded that "the facts unmistakably indicate an intention to abandon the former domicile and adopt a new one." *Id.* at 718. The significance of *Blue* is not simply that a student can acquire domicile where he attends school. It is what the court required before finding that such a change had occurred. The plaintiff's new state had become the center of his employment, property, taxes, banking, transportation, religious life, and personal relationships independent of his status as a student. *Id.* at 716–18.

The same distinction appears in *Gordon v. Steele*, 376 F. Supp. 575 (W.D. Pa. 1974). There, a Pennsylvania student moved to Idaho to attend college and rented an apartment that she retained continuously. *Id.* at 576–77. She expressly stated that she did not intend to return to Pennsylvania, maintained the Idaho apartment even when away, obtained Idaho health coverage, and had made only limited returns to Pennsylvania. *Id.* at 577–78. The court ultimately found Idaho domicile based upon her substantial connection to Idaho and, critically, her "subjective intention of not returning to Pennsylvania in the foreseeable future." *Id.* at 578.

Thus, *Blue* and *Gordon* reinforce Eguiguren's position. They demonstrate the difference between **living somewhere because one attends school there** and **making that place one's home while attending school there**. In both cases, the asserted new domicile was supported by affirmative evidence that the student had built a life in the new state independent of the finite educational reason for initially being there.

That evidence is absent here. As of the relevant time, Eguiguren's Pennsylvania residence was university housing, his Pennsylvania employment was university work-study, and his presence in Pennsylvania tracked his undergraduate enrollment. Nothing about those circumstances, standing alone or together, demonstrates that Pennsylvania had become his home for an indefinite period. Under *Park* and the persuasive student-domicile decisions, they establish residence for education, not a change of domicile.

### C. VILLANOVA CANNOT IDENTIFY ANY STATE THAT EGUIGUREN HAD ADOPTED AS HIS DOMICILE WHEN THIS ACTION COMMENCED

**So what was Eguiguren's permanent U.S. address?** Villanova cannot answer that question because the jurisdictional discovery identifies none. It may argue that Eguiguren intended to remain in Pennsylvania while attending Villanova, that he anticipated remaining somewhere in

the United States after graduation, or that his later employment plans pointed toward North Carolina. None identifies a State that Eguiguren had actually adopted as his home when this action commenced.

That is the fundamental defect in Villanova's position. Domicile is a person's "true, fixed and permanent home and place of habitation"—the place to which he intends to return when absent. *McCann v. Newman Irrevocable Trust*, 458 F.3d 281, 286 (3d Cir. 2006). Although permanence does not require an intention to remain forever, a new domicile requires both residence in the new State and an intention to make that State home for an indefinite period. *Id.* at 286–87. A generalized expectation of living somewhere in the United States does not satisfy that requirement.

**Pennsylvania was not that home.** As discussed above, Eguiguren's Pennsylvania residences were successive Villanova dormitories tied to individual academic years. He maintained no independent Pennsylvania household, did not remain in university housing between academic years, and continued to keep belongings at his family home in Quito. Ex. A (Eguiguren Decl.) ¶¶ 23, 26, 32, 42; Ex C (1st Interrog Ans.) No. 9. His Pennsylvania address changed with his university housing and never became a home independent of his enrollment at Villanova.

**North Carolina was not that home either.** When this action commenced, Eguiguren had no residence, lease, or full-time employment there. Although he hoped SAS might later offer him post-graduate employment in Cary, no offer existed on August 22, 2024. As discussed below, the later SAS offer and subsequent North Carolina plans establish only a potential future move—not a North Carolina domicile at commencement.

Nor does an intention to remain somewhere in the United States solve Villanova's problem. *Areces Coma v. Oliva de Cuebas*, 356 F. Supp. 3d 198 (D.P.R. 2019), is instructive. The student

there lived in Florida, maintained a Florida bank account, and testified that she intended to remain in the continental United States rather than return to Puerto Rico. *Id.* at 201. The court nevertheless held that she had not established Florida domicile because the record did not demonstrate that **Florida itself** had become her home for an indefinite period. *Id.* at 203–05. The distinction is the same here: an intention to build a future somewhere in the United States is not domicile in a particular State.

Villanova's discovery identifies no such State. Pennsylvania was where Eguiguren attended college. North Carolina later became a potential employment destination. His girlfriend was from Maryland. None had become his home when this action commenced. By contrast, Ecuador remained the place from which he traveled to begin senior year, the place to which he had repeatedly returned, and the place where his established home remained. The point is not that Eguiguren could never have acquired domicile in Pennsylvania, North Carolina, or another State. **The point is that Villanova must identify the State that had actually replaced Ecuador as his domicile when this action commenced. It cannot.** The record shows temporary student residence in Pennsylvania, a later potential move to North Carolina, and no fixed U.S. home at all.

### D. THE EVIDENCE VILLANOVA MAY RELY UPON DOES NOT ESTABLISH THAT EGUIGUREN HAD ACQUIRED DOMICILE IN ANY U.S. STATE WHEN THIS ACTION COMMENCED

Undoubtedly, Villanova will contend that the jurisdictional discovery disclosed facts inconsistent with Eguiguren's continued Ecuador domicile. Because the parties have only one opportunity to brief the jurisdictional issue and no opportunity to respond in writing, C.A. addresses those facts here. None establishes that, when this action commenced, Eguiguren had abandoned Ecuador and acquired domicile in Pennsylvania or any other State.

Villanova's jurisdictional discovery identified several facts it may contend are inconsistent

with Eguiguren's Ecuador domicile: his anticipated employment with SAS, his later Pennsylvania driver's license and voter registration, his pre-suit request to vote in Ecuador's election from New Jersey, his Villanova-area bank account, and his relationship with a Maryland resident. None establishes that Eguiguren had made Pennsylvania his home for an indefinite period when this action commenced. Several arose only afterward. Others reflect the ordinary practical consequences of attending college in the United States. And some point away from Pennsylvania altogether.

The timing of the evidence matters. Diversity jurisdiction turns on domicile when the action commences. Later events are not categorically irrelevant, but their role is limited. As *Areces Coma v. Oliva de Cuebas*, 356 F. Supp. 3d 198 (D.P.R. 2019), explained, "[s]ubsequent events may bear on the sincerity of a professed intention to remain but are not part of the primary calculus." *Id.* at 202 (quoting *García Pérez v. Santaella*, 364 F.3d 348, 349 (1st Cir. 2004)). Thus, Villanova may invoke later conduct as evidence bearing upon Eguiguren's sincerity of an asserted earlier intent, but that evidence cannot substitute for proof that the requisite residence and intent already existed when the action commenced

### 1. <u>The Post-Commencement SAS Offer Establishes Neither Pennsylvania Nor North Carolina Domicile</u>

**The SAS evidence establishes neither a Pennsylvania nor a North Carolina domicile when this action commenced.** As of August 22, 2024, Eguiguren had completed a summer internship with SAS and hoped that it might lead to full-time employment. But no employment offer existed. When Villanova specifically asked what type of position Eguiguren hoped to receive, he answered that he hoped to work **in person in Cary, North Carolina**, and did not hope or expect to work remotely from Pennsylvania. Ex D (2nd Interrog Ans.) No. 2. He likewise confirmed that he had submitted no applications for post-graduate employment in Pennsylvania as of August 22,

2024. *Id.* No. 1.

The chronology is significant:

- **August 22, 2024 — commencement:** Eguiguren had no SAS employment offer, no North Carolina residence, and no applications for post-graduate employment in Pennsylvania. He hoped that SAS might eventually offer him an in-person position in Cary. *Id.* Nos. 1–2.

- **September 27, 2024 — 36 days after commencement:** SAS first extended a full-time employment offer. *Id.* Nos. 1, 3; Ex. E (Initial Production) at EGUIGUREN0033–0034.

- **October 28, 2024 — 67 days after commencement:** Eguiguren was still considering the offer and discussing with his parents the available work-location options, including Cary. *Id.* No. 3; Ex. D (Second Interrog. Answers) No. 3; Ex. F (Supplemental Production) at EGUIGUREN0041, 0043.

- **October 31, 2024 — 70 days after commencement:** Eguiguren accepted the position on the basis that he would work in person in Cary, North Carolina. *Id.* Nos. 1, 3–4; Ex. F (Supplemental Production) at EGUIGUREN0044

- **March 27, 2025 — 217 days after commencement:** Eguiguren traveled to Cary to investigate apartments in anticipation of the future job. He never entered a North Carolina lease. Ex. A (Eguiguren Decl.) ¶¶ 46–48; Ex. F (Supplemental Production) at EGUIGUREN0042, 0045–0051.

- **April 15, 2025 — 236 days after commencement:** SAS rescinded the offer before Eguiguren moved to North Carolina or began employment there. Ex D (2nd Interrog Ans.) Nos. 1, 4; Ex. E (Initial Production) at EGUIGUREN0023–0024.

That sequence defeats a Pennsylvania-domicile theory. The only Pennsylvania employment arrangement Villanova can identify arose in the SAS offer made **36 days after commencement**, which initially permitted remote work from Pennsylvania. But Eguiguren had not sought a Pennsylvania position before suit, did not expect or hope to work remotely from Pennsylvania as of August 22, and ultimately rejected that location in favor of working in person in Cary. Ex D (2nd Interrog Ans.) Nos. 1–4. A post-commencement employment option that Eguiguren did not ultimately select cannot establish that Pennsylvania was already his home when this action began.

The same evidence does not establish North Carolina domicile. Eguiguren's hope on

August 22 that SAS might eventually offer him employment in Cary was exactly that—a future possibility. He had no employment offer, residence, lease, or household in North Carolina. A change of domicile requires both residence in the new State and an intent to remain there. *McCann v. Newman Irrevocable Trust*, 458 F.3d 281, 286–87 (3d Cir. 2006). Eguiguren did not even begin investigating North Carolina housing until 217 days after commencement, and the contemplated move never occurred because SAS rescinded the offer.

The SAS evidence therefore shows the possibility of a **future** change of domicile, first contemplated and later pursued in North Carolina. It does not show that either Pennsylvania or North Carolina had displaced Ecuador when this action commenced.

### 2. Villanova Cannot Rely on a Pennsylvania Driver's License Obtained Months After Commencement to Prove Eguiguren's Earlier Domicile

Eguiguren did not have a Pennsylvania driver's license when this action commenced. He obtained one on November 20, 2024. Ex C (1st Interrog Ans.) No. 4; Ex. E (Initial Production) at EGUIGUREN0008. Villanova may argue that obtaining the license is evidence that Eguiguren regarded Pennsylvania as his home. But the license was issued only later, and the cases do not permit a single formal state connection to control the domicile inquiry.

*Areces Coma* is directly instructive. The court recognized that driver's licenses, bank accounts, and voter registrations are relevant domicile considerations, but cautioned that such "superficial" ties do not establish domicile on their own. *Areces Coma*, 356 F. Supp. 3d at 203. Rather than mechanically counting those connections, the court emphasized the need to determine whether the individual had actually severed the "bridges to the former domicile." *Id.*

The Third Circuit reached the same practical conclusion in *Freidrich v. Davis*, 767 F.3d 374 (3d Cir. 2014). There, Davis possessed an actual Pennsylvania driver's license listing a Pennsylvania address and maintained Pennsylvania bank accounts. *Id.* at 376, 378–79. Yet those

formal Pennsylvania ties did not establish Pennsylvania domicile because the objective evidence as a whole showed that Germany remained his home. The Court expressly held that, "[a]lthough Davis continues to have some ties to Pennsylvania, including some bank accounts and a Pennsylvania driver's license," the district court properly found him domiciled in Germany. *Id.* at 379.

That comparison is significant. Davis possessed his Pennsylvania license while the domicile question was being litigated. Eguiguren did not even acquire his Pennsylvania license until after the jurisdictionally controlling date. If an existing Pennsylvania driver's license was not dispositive in *Freidrich*, a subsequently issued license cannot establish, without more, that Eguiguren had already abandoned Ecuador and made Pennsylvania his indefinite home months earlier.

#### 3. Villanova Cannot Rely on Later Pennsylvania Voter Registration When Eguiguren Never Voted in Pennsylvania and Continued Exercising His Ecuadorian Political Rights

Eguiguren was not registered to vote in Pennsylvania when this action commenced. His Pennsylvania voter registration began months later, when he was presented with a voter-registration application while obtaining his Pennsylvania driver's license on November 20, 2024. Ex C (1st Interrog Ans.) No. 7. He thereafter completed the registration process and was enrolled to vote in Radnor Township on January 15, 2025. *Id.*

The timing and surrounding circumstances matter. By then, Eguiguren had already accepted post-graduate employment in Cary, North Carolina. Ex D (2nd Interrog Ans.) Nos. 3–5. He explained that his interest in registering arose from his desire, as a dual United States citizen, to participate in the 2024 presidential election—not from an intention to make Pennsylvania his permanent home. *Id.* No. 5. Whatever significance that later registration may have, it cannot

establish that Pennsylvania was already Eguiguren's domicile on August 22, 2024.

His actual exercise of political rights points in the opposite direction. **Eguiguren never voted in a Pennsylvania election**. Ex C (1st Interrog Ans.) No. 7; Ex. A (Eguiguren Decl.) ¶¶ 49, 58–61; Ex. E (Initial Production) at EGUIGUREN0030–0031. On April 13, 2025, after his Pennsylvania registration became effective, **he voted in an Ecuadorian election**, and he later appeared in Quito in connection with Ecuador's November 2025 referendum. *Id.* Thus, the subsequent record does not show that Eguiguren replaced Ecuadorian political participation with Pennsylvania political participation.

That distinction accords with *McCann*, which identifies the "exercise of political rights" as relevant to domicile. 458 F.3d at 286. The Pennsylvania registration is therefore one later formal connection to Pennsylvania; it is not evidence that Pennsylvania had become Eguiguren's home months earlier when this action commenced.

#### 4. **Eguiguren's Pre-Suit Change of His Ecuadorian Polling Location to New Jersey Did Not Establish an Intent to Make Pennsylvania His Home**

Villanova may also rely on an event that occurred before commencement: on May 1, 2024, Eguiguren requested that his polling location for Ecuador's February 2025 general election be changed from Quito to the Ecuadorian electoral precinct in Hightstown, New Jersey. Ex. A (Eguiguren Decl.) ¶ 36; Ex. C (First Interrog. Answers) No. 7; Ex. E (Initial Production) at EGUIGUREN0031. That fact does not establish Pennsylvania domicile.

The request concerned **where Eguiguren would cast an Ecuadorian ballot**, not whether he had abandoned Ecuadorian political affiliation. It preserved his ability to participate in Ecuador's election while he expected to be attending Villanova during the spring 2025 academic semester. The action is therefore fully consistent with his status as an Ecuadorian voter temporarily

studying in the United States.

Nor does the selection of New Jersey establish anything about an intention to remain in Pennsylvania. The polling location was in Hightstown, New Jersey, not Pennsylvania. At most, the May 2024 request indicates that Eguiguren anticipated being in the United States during the February 2025 school term. That was already evident from the fact that he was enrolled at Villanova through senior year. It does not establish an intention to remain in Pennsylvania indefinitely.

The subsequent voting history confirms the limited significance of the precinct change. Eguiguren continued to exercise Ecuadorian voting rights after the change and after becoming registered in Pennsylvania. Ex. A (Eguiguren Decl.) ¶¶ 49, 58–63; Ex. E (Initial Production) at EGUIGUREN0029–0031. Rather than evidencing an abandonment of Ecuador, the polling-location request was a means of continuing his participation in Ecuadorian elections while temporarily abroad. Accordingly, Villanova cannot convert Eguiguren's effort to vote in an **Ecuadorian election** into proof that he had abandoned Ecuador as his domicile.

#### 5. A Villanova-Area Bank Account Does Not Establish That Pennsylvania Became Eguiguren's Indefinite Home

Villanova's discovery also established that Eguiguren opened a Chase Bank account in Villanova, Pennsylvania when he began college in August 2021. Ex C (1st Interrog Ans.) No. 8. That is relevant, but it does not materially advance the domicile inquiry. Eguiguren did not replace his Ecuadorian banking relationship with a Pennsylvania one. He had opened an account at Banco Pichincha in Quito in 2020, before beginning Villanova, and both accounts remained open. *Id*; Ex. A (Eguiguren Decl.) ¶ 10; Ex. E (Initial Production) at EGUIGUREN0021–0022. The record therefore reflects parallel accounts serving different practical circumstances, not the abandonment of one financial home for another.

That is precisely the type of evidence *Areces Coma* cautioned against overvaluing. The student there had opened a bank account in Florida while attending university, yet the court still found Puerto Rico to be her domicile. 356 F. Supp. 3d at 201, 203–05. A local bank account was a practical connection to the place where she attended school; it did not establish the intent necessary to make Florida her indefinite home. Additionally, the Third Circuit's decision in *Freidrich* is consistent. Davis maintained Pennsylvania banking connections even though the objective record established German domicile. 767 F.3d at 376, 379. Bank accounts are relevant under *McCann*, but they are part of the totality of the circumstances, not a proxy for domicile.

The same is true here. An undergraduate studying in Pennsylvania for four academic years had an obvious practical reason to maintain access to a United States banking institution. The more significant fact is that Eguiguren maintained the Banco Pichincha account he had opened while living in Quito. The Chase account therefore does not show that Pennsylvania displaced Ecuador as his home.

**6. <u>Eguiguren's Relationship With a Maryland Resident Does Not Establish Pennsylvania Domicile</u>**

Villanova may also point to Eguiguren's relationship with a woman from Maryland. That evidence does not establish Pennsylvania domicile. The two never lived together; during summer 2024, she returned to Maryland while Eguiguren returned to Ecuador; and during senior year, she lived off campus with friends while he remained in a Villanova dormitory. Ex C (1st Interrog Ans.) No. 6. His June 2024 visit to her likewise consisted of travel from Ecuador to Maryland and a return to Ecuador ten days later. *Id.* No. 14. The relationship therefore created no Pennsylvania household and no objective basis to conclude that Pennsylvania had become Eguiguren's home. See *McCann*, 458 F.3d at 286.

### 7. **<u>If Eguiguren's Villanova Residence Made Him a Pennsylvania Domiciliary, Then C.A.'s Villanova Residence Undermines Complete Diversity for Similar Reasons</u>**

There is an additional problem with any theory that treats Eguiguren's attendance at Villanova and residence in university housing as sufficient to establish Pennsylvania domicile. Villanova removed this action on the premise that C.A. was a citizen of Virginia, even though C.A. likewise attended Villanova and lived in university housing. If the ordinary incidents of attending Villanova are sufficient to transform an out-of-state student into a Pennsylvania domiciliary, that same reasoning calls into question the premise of complete diversity on which Villanova removed this action. Complete diversity requires that "no plaintiff [may] be a citizen of the same state as any defendant." *Lincoln Benefit Life Co. v. AEI Life, LLC*, 800 F.3d 99, 104 (3d Cir. 2015) (quoting *Zambelli Fireworks Mfg. Co. v. Wood*, 592 F.3d 412, 419 (3d Cir. 2010)).

**Villanova cannot have it both ways.** If attendance at Villanova, residence in university housing, and the ordinary incidents of student life are sufficient to make Eguiguren a Pennsylvania domiciliary, then those same considerations necessarily undermine Villanova's premise that C.A. remained solely a Virginia citizen for diversity purposes. **Either Eguiguren remained domiciled in Ecuador, or Villanova's own theory places both sides in Pennsylvania. Complete diversity fails either way.**

## E. EGUIGUREN'S ECUADOR DOMICILE DEFEATS DIVERSITY JURISDICTION

Once Eguiguren's domicile is determined to have been Ecuador when this action commenced, the jurisdictional consequence is settled. A United States citizen domiciled abroad is not a citizen of any State for purposes of 28 U.S.C. § 1332. His presence as a party therefore defeats diversity jurisdiction. The Supreme Court established that rule in *Newman-Green, Inc. v. Alfonzo-Larrain*, 490 U.S. 826 (1989). One defendant, Bettison, was a United States citizen

domiciled in Venezuela. *Id.* at 828. In determining whether § 1332 permitted the action to proceed, the Court explained that, "[i]n order to be a citizen of a State within the meaning of the diversity statute," a natural person must be both a United States citizen and domiciled within a State. *Id.* Because Bettison was a United States citizen but had no state domicile, he was "stateless" for purposes of diversity jurisdiction. *Id.* at 828–29. His status destroyed complete diversity. *Id.* at 829.

The Third Circuit applied *Newman-Green* in *Swiger v. Allegheny Energy, Inc.*, 540 F.3d 179 (3d Cir. 2008). There, the jurisdictional defect arose because a partner in a defendant law firm was a dual United States and United Kingdom citizen domiciled in the United Kingdom. *Id.* at 181–84. The Third Circuit held that an American citizen domiciled abroad is "stateless" because the person is neither a citizen of a State under § 1332(a)(1) nor a foreign citizen for purposes of § 1332(a)(2). *Id.* at 184. Accordingly, "American citizens living abroad cannot be sued (or sue) in federal court based on diversity jurisdiction." *Id.*

*Freidrich v. Davis*, 767 F.3d 374 (3d Cir. 2014), confirms the rule in the context of an individual party. Davis was a United States citizen whom the district court found domiciled in Germany. *Id.* at 375–78. The Third Circuit held that the finding had a necessary jurisdictional consequence: because Davis was domiciled abroad, he was stateless for purposes of § 1332 and "cannot sue or be sued in diversity." *Id.* at 378. The Court affirmed dismissal for lack of subject-matter jurisdiction. *Id.* at 379.

Eguiguren's Ecuadorian citizenship does not provide an alternative basis for alienage jurisdiction. *Swiger* rejected that precise theory as to a dual national. The Third Circuit held that "for purposes of diversity jurisdiction, only the American nationality of a dual national is recognized." 540 F.3d at 185 (quoting *Frett-Smith v. Vanterpool*, 511 F.3d 396, 400 (3d Cir.

2008)). Thus, a dual United States and foreign citizen cannot avoid the stateless-citizen rule by invoking his foreign nationality under § 1332(a)(2). *Id.* Only domicile in a particular State could supply state citizenship for diversity purposes. *Id.*

That resolves the jurisdictional issue here. Eguiguren is a **dual citizen of the United States and Ecuador**. Ex. A (Eguiguren Decl.) ¶ 3. For the reasons set forth above, the jurisdictional record establishes that his domicile remained Ecuador when this action commenced. Under *Newman-Green*, *Swiger*, and *Freidrich*, a United States citizen domiciled abroad is not a citizen of any State for purposes of § 1332, and Eguiguren's Ecuadorian citizenship cannot independently supply alienage jurisdiction because, for diversity purposes, his United States citizenship controls. He was therefore "stateless" under § 1332. Complete diversity was absent, and this action must be remanded.

### F. REMAND RETURNS THIS ACTION TO THE PHILADELPHIA COURT OF COMMON PLEAS

Because this action was removed from the Philadelphia Court of Common Pleas, that is the court to which it must be remanded. Section 1447(c) requires remand when subject-matter jurisdiction is lacking, and § 1447(d) identifies a remand as one "to the State court from which it was removed." 28 U.S.C. § 1447(c)–(d).

The Third Circuit has made the point explicit: **"'Remand' means 'send back.' It does not mean 'send elsewhere.'"** *Allied Signal Recovery Trust v. AlliedSignal, Inc.*, 298 F.3d 263, 270 (3d Cir. 2002) (quoting *Bloom v. Barry*, 755 F.2d 356, 358 (3d Cir. 1985)) (emphasis added). A federal district court may return a removed action to the state court where it originated; it lacks authority to "remand" the action to a different state court. *Id.* Accordingly, if this Court concludes that diversity jurisdiction is absent, the appropriate disposition is remand to the Philadelphia Court of Common Pleas, from which Villanova removed the action.

The Supreme Court recently reaffirmed the importance of the plaintiff's choice of forum in precisely the removal-and-remand context. In *Hain Celestial Group, Inc. v. Palmquist*, 607 U.S. 421, 423 (2026), the Court emphasized that "the plaintiff is 'the master of the complaint'" and generally possesses the right to choose the forum in which to proceed. The Court further recognized the resulting prejudice when a defendant seeks to override that choice, explaining that "plaintiffs are ordinarily allowed to select whatever forum they consider most advantageous." *Id.* at 433 (quoting *Atlantic Marine Constr. Co. v. United States Dist. Court for Western Dist. of Tex.*, 571 U.S. 49, 63 (2013)). The Court therefore rejected an attempt to use federal procedure to preserve federal jurisdiction over an action the plaintiffs had chosen to pursue in state court.

C.A. made that choice here. She commenced this action in the Philadelphia Court of Common Pleas, and Villanova removed it to federal court. If diversity jurisdiction was absent, the consequence is not transfer to some other state tribunal. Remand means return of the action to the forum C.A. selected and from which Villanova removed it—the Philadelphia Court of Common Pleas.

## V. <u>CONCLUSION</u>

Villanova bears the burden of establishing diversity jurisdiction. Yet, there is a series of questions Villanova cannot answer. When, exactly, before August 22, 2024, did Eguiguren abandon Ecuador as his domicile? What event converted his Villanova dormitory from student housing into his indefinite home? What Pennsylvania residence did he establish independent of Villanova? What Pennsylvania employment had he secured? What Pennsylvania voter registration or driver's license did he possess at the time? What Pennsylvania lease, tax obligation, vehicle registration, household, or post-graduate commitment tied him to the Commonwealth? And if Villanova residence itself is enough, why does the same reasoning not undermine Villanova's

premise that C.A. remained a Virginia citizen while attending Villanova? Villanova can identify later events and ordinary incidents of student life. It cannot identify the moment, or the facts, by which Pennsylvania actually displaced Ecuador as Eguiguren's domicile before this action commenced.

The jurisdictional record establishes that Eguiguren remained domiciled in Ecuador when this action commenced and does not establish that he had acquired domicile in any State. As a dual United States and Ecuadorian citizen domiciled abroad, Eguiguren was "stateless" for purposes of § 1332. Complete diversity was therefore absent. C.A. respectfully requests that the Court grant Eguiguren's Motion to Remand and return this action to the Philadelphia Court of Common Pleas, the state court from which Villanova removed it.

Respectfully Submitted,

**EDELSTEIN LAW, LLP**



Jay L. Edelstein, Esquire
*Counsel for Plaintiff C.A.*